THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERNANDEZ BAILEY, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL MOTEN, Defendant-Appellant.

First District (1st Division)    Nos. 1—89—1687, 1—91—1381 cons.

Opinion filed April 25, 1994.—Rehearing denied August 23, 1994.

Rita A. Fry, Public Defender, of Chicago (Dennis E. Urban, Assistant Public Defender, of counsel), for appellant Darryl Moten.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant Hernandez Bailey.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth McCurry, and Michael Golden, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendants Hernandez Bailey and Darryl Moten were convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and two counts of attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a)). The trial judge sentenced Bailey to life imprisonment on the murder conviction and concurrent 10-year prison terms on the two counts of attempted murder, and Moten to 35 years on the murder conviction and concurrent six-year prison terms on the two counts of attempted murder. Both defendants filed timely appeals. The appeals have been consolidated.

On appeal both defendants contend that the State failed to prove them guilty beyond a reasonable doubt. Intertwined in Bailey's reasonable doubt argument are contentions that the court erred in (1) concluding that Torrence Adams' testimony was sufficient to hold Bailey accountable for the acts of Moten; (2) refusing to consider impeachment evidence of Adams' testimony; (3) overruling an objection to the State's attempt to argue by way of inference that Thompson's recantation was due to intimidation at the penitentiary, in the absence of any evidence to that effect; and (4) giving substantive weight to a prior inconsistent statement which was received only for impeachment purposes. Moten also challenges his sentence as being excessive. For the reasons set forth below, we affirm the convictions and sentences of both defendants. The relevant facts appearing in the record on appeal are as follows.

On May 8, 1987, Anthony Jackson was fatally shot and Brandon Abrams and Anthony Camphor were shot and injured during a melee occurring near an elevator on the ground level of a Chicago Housing Authority building at 4101 South Federal Street in Chicago. Brandon Abrams, Michael Thompson and Torrence Adams testified on behalf of the State. Prior to testifying, they were all placed in a jury room

adjacent to the courtroom, in the company of the investigating police officers and the trial assistant State's Attorney, and collectively prepared for testifying.

Brandon Abrams, one of the gunshot victims, testified that on May 8, 1987, several men were standing in front of a game room at 41st Street and Wentworth Avenue when Lenora Camphor (the aunt of one of the other alleged gunshot victims, Anthony Camphor) became embroiled in an argument with yet another of the gunshot victims, Anthony Jackson, now deceased. During the argument, an unidentified male threw a brick at the group and ran away. Abrams and Camphor chased him to 4101 South Federal. Jackson remained on the bridge arguing with Lenora, but followed Abrams and Camphor shortly thereafter.

Abrams testified that as he and Camphor ran under the breezeway of the 4101 building into the elevator area, he observed about 10 people standing around, including the other two State witnesses, Michael Thompson and Torrence Adams. Abrams asked did they see where "old boy" (the person who threw the brick) went. Someone replied "there they go." Next Abrams heard someone say "shoot them marks." He then stated "then a lot of peoples [*sic*] got to shooting and I got shot in the butt." Abrams testified that he was running away when Anthony Jackson, who had entered the breezeway and had stopped to tie his shoe, was shot in the stomach. Abrams observed that after the shooting stopped, Camphor, who was running with them, had a scrape wound on his nose which was not there when they entered the breezeway (before the shooting).[1]

Abrams was unable to identify the shooter or the person who uttered the words "shoot them marks," although he said the gunshots came from the group standing in front of the elevator. Abrams admitted that he and Camphor were both members of the Vice Lords gang. But he denied that he, Camphor or Jackson was armed with any type of weapon on that evening.

Three days later Abrams viewed a lineup and he identified defendant Bailey as looking similar to one whom he saw at the elevator on May 8. He also identified defendant Bailey at trial as being the familiar face that he identified at the lineup. He was unable to say that it was Bailey whom he heard say "shoot them marks," and he stated that the person who said "shoot them marks" did not have a gun.

Torrence Adams, the State's next eyewitness, testified that at the time of the incident he had known Moten for five years and did not personally know Bailey but had heard of and seen him twice on the

---

[1]Camphor did not testify at trial.

streets. He was aware that Bailey's nickname was "Peanut." Adams, 18 years of age at the time of trial, testified that he was a "close associate of Moten's sister and was not friends with Moten but liked and respected him." Adams also testified that he is a friend of Abrams and Camphor. Adams denied that he is a gang member, but on cross-examination he admitted he was, in May of 1987, a member of the "Mickey Cobras" gang, which was at war with the Disciples gang at that time. On the night of this shooting, Adams and Thompson were returning from a liquor store and, as they walked through the elevator area, Adams saw a group of people standing there, including four "parties," meaning four Disciple gang members. Of the four men, the only one whose name Adams knew was Moten, but he identified Bailey as one of the three men standing in the area with Moten. As Adams and Thompson left the area, two "parties" were running through the area followed by a third person. The first one was called "Ant." One of the men asked Adams if he knew the man who had run through the breezeway, and Adams tried to signal to the men "to look over there," but the others did not understand. At this time, a fourth man, who was not wearing a shirt, ran to the breezeway and stooped to tie his shoe. Moten turned around and fired a gun and Bailey said "shoot." However, on cross-examination, Adams stated he did not know whether it was Bailey who said "shoot." As Adams ran away he saw the man without the shirt fall to the ground. Adams testified that he did not see Abrams or Camphor carrying sticks.

Allegedly, due to a misunderstanding, Adams was placed in a lineup on May 11, 1987, and interviewed by police officers after the lineup. Adams insisted at trial that he had, during this interview, told the officers he saw "Peanut" at the scene of the shooting, but on cross-examination, he was unable to remember the name of the officer with whom he had spoken. It was subsequently stipulated that he had not in fact told one of the interviewing officers, Detective Kelly, that "Peanut" was on the scene.

The third occurrence witness for the State, Michael Thompson, testified that he is currently serving a six-year prison sentence for aggravated battery. Thompson has known Bailey for all of his life and also knows codefendant Moten as well as Adams. On May 8, 1987, he came out of the building and passed through the elevator area as some men came through talking to each other. He heard one man say, "[I]s that him, Chief[?]" and the man with no shirt say, "[I]is that him T[?]," referring to Thompson. Someone responded "that's M.T." and another person said, "yeah, that's him," while a third joined in, "well, let's get him." Thompson testified at trial that after this dialogue, a man standing by the wall turned and shot one of the

men, but because it was dark, he did not see who fired the shots. Neither did Thompson hear Bailey say "shoot him, shoot him" prior to shots being fired, according to his testimony.

At this point in Thompson's testimony, the State moved to declare Thompson a hostile witness in light of Thompson's earlier statements to a police officer and before a grand jury identifying Moten and Bailey as participants in the shooting. The trial court allowed the State to interrupt Thompson's testimony and call Detective Kelly. This *voir dire* testimony of Detective Kelly was offered for the purpose of determining whether to declare Thompson a hostile witness.

Detective Kelly testified that on May 11 and 12, 1987, he interviewed Thompson regarding the homicide of Anthony Jackson and the attempted murder of Brandon Abrams and Anthony Camphor. Detective Kelly stated that Thompson had told him that he heard Bailey say "shoot him, shoot him" and Moten then fired several shots at Jackson. Thompson also told him that he saw Moten shoot Jackson. Detective Kelly also testified to a conversation which he overheard on the day of trial between Thompson and the assistant State's Attorney as she prepared him to testify. He stated that Thompson said he saw Moten shoot Jackson and heard Bailey say "shoot him, shoot him." The court declared Thompson a hostile witness.

After Detective Kelly's *voir dire* testimony, Thompson resumed the witness stand. He testified that he was not sure who fired the gun because it was dark. He did, however, admit that he had told the police on May 11, 1987, that he saw and heard Bailey say to Moten "shoot him, shoot him," and he then saw Moten pull a gun from his waist band and fire several shots through the breezeway, striking Anthony Jackson. He further acknowledged that he testified in the same manner before the Cook County grand jury. Additionally, he confirmed that on May 12, 1987, he identified Bailey at a lineup as the person who shot at him six times. When asked about a statement made in the jury room prior to trial, that Bailey and Moten were the offenders, he said "yes, yes, I think so" as to Bailey telling Moten to shoot; however, he said he was not sure that he had said Moten was the shooter.

The State sought to elicit from Thompson that while in the jury room he made a statement that he was mad at the State for not getting him a better deal, and he admitted making such a statement. Then he modified it slightly by saying he told the State it had a "lot of nerve after, you know, sending me to the penitentiary, expect me to come down here and testify against somebody, send them to the penitentiary also."

Thompson stated that he told the defense counsel, Mr. William Swano, that he didn't see anything and the reason he told him that was to get favors from Swano in exchange for favorable testimony for Bailey and Moten. Thompson admitted to "playing" with Swano and wanting him to make phone calls and get cigarettes for him.

During examination by defense counsel, Thompson recanted all prior accusations against both Moten and Bailey, stating that everything he had previously stated was a lie. The explanation that he provided for having falsified statements both to the grand jury and to the investigating police officers included the following: (1) he had prior altercations with Bailey; (2) he needed a place to live at that time; and (3) the State's Attorney's office offered to pay his rent, feed him and provide money for him and Torrence Adams as part of the witness protection program if he would testify against Bailey. Thompson said that he would be "killing two birds with one stone by getting rid of Mr. Bailey, also." He testified that he and Torrence Adams had conspired to pin the murder and shootings on Bailey.

While Thompson persisted in his denial of being able to identify anyone in connection with this offense, according to his sworn statements to the grand jury on May 13, 1987, (1) he saw Moten reach in his waist band, pull a revolver and shoot at Jackson point blank; (2) Bailey told Moten to "hit him"; and (3) Moten shot Jackson in the stomach. He told the police the same thing he told the grand jury.

The parties stipulated to the testimony of Detective Grady regarding the lineup and Thompson's identification of Bailey as the person he heard say "shoot him, shoot him." They also stipulated to the testimony of Dr. Rosen, the medical doctor on call at the hospital the night Abrams was treated for a gunshot wound to his right buttock. Dr. Michael Chambliss, a forensic pathologist, testified as to the cause of death of Anthony Jackson. Upon offering certain exhibits including photographs into evidence, the State rested its case in chief. A motion for a directed finding was denied as to both defendants.

The defense presented evidence by way of stipulation. It was stipulated between the parties that if Detective Kelly were called to testify, he would state that on May 11, 1987, he interviewed Torrence Adams after a lineup. At no time during that interview did Adams mention that Hernandez Bailey or "Peanut" was present at the scene of the shooting; at no time did Adams state that he overheard Bailey or "Peanut" tell anyone to "shoot"; and he told Detective Kelly that on the night in question he observed Camphor and Abrams carrying sticks as they ran through the breezeway.

The parties further stipulated that if Victoria Ondriska were to testify, she would state that on May 13, 1987, she was employed as an official court reporter for the State of Illinois and was assigned to report the proceedings before the Cook County grand jury; that Torrence Adams was a witness before the grand jury in connection with the homicide and attempted murder of the victims in the instant case; and that he never mentioned in his testimony that Hernandez Bailey or "Peanut" was in the vicinity of the scene of the shooting of May 8. With these stipulations and the admission of certain photographic exhibits, the defense rested. The State presented no rebuttal. The court then heard closing arguments on behalf of the State and both defendants.

The trial court found that Abrams' testimony did not connect either defendant to the shooting and concluded that it would not rely on his testimony for either defendant. As to Moten, the court found that Torrence Adams made an "excellent" identification and testified convincingly. It also assigned some weight to Thompson's out-of-court identification of Moten as the shooter. The court commented that while Thompson's out-of-court statements implicating Bailey were insufficient standing alone to convict Bailey, they were sufficient when coupled with Adams' testimony.

The specific findings of the court were: (1) it boils down to the testimony of Adams, Thompson and to some extent, Detective Kelly; (2) Thompson in his testimony stated he could not identify anyone, but he told Detective Kelly that Moten fired shots and that Bailey said "shoot"; (3) Thompson said he "implicated the defendants because they were rival gang members"; he had been ejected from his house or where he had been living and needed a place to live; he needed funds for food; and "he didn't care much for the defendants"; and (4) Thompson now has a motive to recant his earlier identification of the defendants as the perpetrators of an act because of his anger toward the State's Attorney for having successfully prosecuted, convicted and incarcerated him, in that he had hoped to gain some advantage in whatever charges were pending against him by testifying on behalf of the State. Such an advantage apparently did not come to fruition. The court then found both defendants guilty of the murder of Anthony Jackson and guilty of the attempted murder of Brandon Abrams and Anthony Camphor.

We are now called upon to determine whether the State presented sufficient evidence to convict defendants Moten and Bailey beyond a reasonable doubt of murder and attempted murder. We are guided by certain basic principles in reviewing a claim of insufficiency of the evidence. We are mindful that we must be careful to

defer to the observations and credibility determinations made by the fact finders who had the opportunity to view and hear the witnesses testify. The relevant inquiry on review is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) We likewise are guided by the principle that once we adhere to the aforementioned rule, and carefully comb the record, should we find the evidence to be insufficient to remove all reasonable doubt of defendants' guilt and not sufficient to create an abiding conviction of defendants' guilt, we would be compelled to reverse their convictions. *Young*, 128 Ill. 2d at 48.

A reviewing court may only disturb the trial court's finding as to credibility when the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. McCarthy* (1981), 102 Ill. App. 3d 519, 522, 430 N.E.2d 135; *People v. Dempsey* (1993), 242 Ill. App. 3d 568, 586, 610 N.E.2d 208.) Where the evidence is merely conflicting, the reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Silas* (1989), 185 Ill. App. 3d 920, 933, 541 N.E.2d 1239, *appeal denied* (1989), 127 Ill. 2d 636, 545 N.E.2d 126.) It is, however, the reviewing court's prerogative to disbelieve a witness where his testimony in the record is inherently incredible. (*People v. Brisker* (1988), 169 Ill. App. 3d 1007, 1012, 523 N.E.2d 1191, *appeal denied* (1988), 122 Ill. 2d 580, 530 N.E.2d 251.) When presented with a challenge to the sufficiency of the evidence, it is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses. (*People v. Parker* (1992), 234 Ill. App. 3d 273, 274.) In such a case, a court of review must reverse a criminal conviction where the evidence and/or the credibility of the witnesses is so improbable or so unsatisfactory as to raise a reasonable doubt of guilt. *People v. Stokes* (1989), 185 Ill. App. 3d 643, 675, 541 N.E.2d 1129; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

Bearing these principles in mind, we must look to the specific testimony offered by Adams and Thompson in its entirety and the extent to which it was either impeached or disavowed at trial. Moten's argument is twofold. He takes issue with the court's credibility determination of Adams' testimony regarding the shooting of Anthony Jackson and suggests that the identification by Adams was so doubtful as to create a reasonable doubt of his guilt.

In a bench trial, it is for the trial judge to determine the credibility of witnesses, to weigh evidence and draw reasonable

inferences therefrom, and to resolve any conflicts in the evidence. (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317.) It is not the function of the reviewing court to retry a defendant; rather, the determination of the credibility of the witnesses, the weight to be given their testimony and reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. *People v. Tye* (1990), 141 Ill. 2d 1, 565 N.E.2d 931.

●1 As to Moten, the court found that Torrence Adams made an "excellent" identification. The court said it was not relying at all on the testimony of Brandon Abrams as to the identification of any suspects, because he was not able to identify anyone. The court assigned some weight to Thompson's earlier identification of Moten as the man who shot the victims.

Because the trial court was in a better position to assess the credibility of the witnesses, we will not disturb the court's findings. Adams never wavered in his identification of Moten, notwithstanding his impeachment as to some of his testimony about Bailey. The trial court, unlike this court, had an opportunity to observe Adams' demeanor and obviously took into consideration any conflicts or inconsistencies in his testimony. Adams testified that he knew Moten and that he saw Moten turn around and fire several shots near the elevator and breezeway. Anthony Jackson was killed by gunfire and Brandon Abrams and Anthony Camphor were wounded. Moreover, Adams' testimony that Moten did the shooting was corroborated by the out-of-court statements Michael Thompson made before the grand jury and to the investigating police officers. While Thompson testified to a motive for lying about Bailey, he never testified that he had a motive to falsely accuse Moten. Thompson's prior statements were admitted as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS Ann. 5/115—10.1 (Michie 1993)). Since a reviewing court does not have the same opportunity to observe the witnesses, it should not substitute its judgment for that of the trial court. *People v. Silas* (1989), 185 Ill. App. 3d 920.

●2 Moten further contends that there was insufficient evidence to prove that he committed the attempted murder of Anthony Camphor. He asserts that evidence is lacking that anyone fired any bullets at Camphor on the date in question and Camphor did not testify. The only evidence presented by the State was that after the shooting occurred, it was observed by Abrams that Camphor had a fresh scrape wound on his nose. He contends that the State has failed to present proof beyond a reasonable doubt of the specific intent required to sustain its burden on a charge of attempted murder.

A person commits an attempt when, with the intent to commit a specific offense, he does any act which constitutes a substantial step towards commission of that offense. (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a).) The prosecution must prove every element of the offense beyond a reasonable doubt. *People v. Kirilenko* (1953), 1 Ill. 2d 90, 94, 115 N.E.2d 297.

The requisite mental state may be inferred from defendant's conduct and the circumstances surrounding his commission of the offense. (*People v. Terrell* (1989), 132 Ill. 2d 178, 204, 547 N.E.2d 145.) The necessary mental state may also be inferred from evidence that defendant voluntarily and willfully committed an act and that the natural tendency of such act was to destroy another's life. (*People v. Latimer* (1966), 35 Ill. 2d 178, 182-83, 220 N.E.2d 314.) Clearly, Moten's conduct in shooting down a breezeway in which several people were running is sufficient evidence to prove a specific intent to kill beyond a reasonable doubt.

Moten's act in firing multiple shots in the direction of a group of persons near the elevator and breezeway constitutes a substantial step toward killing someone and he did in fact succeed in killing Anthony Jackson and injuring Abrams and Camphor. When Anthony Jackson got up and started running in the breezeway, Moten turned around and started firing his gun. Jackson fell to the ground with two gunshot wounds that caused his death. Abrams started running and was shot in the buttocks. Before Camphor entered the breezeway, he was not injured, and immediately after the shooting, he had a wound on his nose. The record reflects no activity other than shooting in the area. There is no other explanation for Camphor sustaining a wound. There were multiple shots fired in the direction of Camphor, as well as Abrams and Jackson.

In light of the above factual matrix, the only reasonable explanation for the wound is that it was caused by the shooting. Moreover, an injury need not have occurred. To sustain a charge of attempted murder, it is sufficient to discharge a weapon in the direction of another individual, either with malice or total disregard for human life (*People v. Woods* (1978), 62 Ill. App. 3d 381, 378 N.E.2d 1271), which the State has amply demonstrated. Intent to kill is a requisite element of attempted murder. (*People v. Smith* (1980), 90 Ill. App. 3d 83, 412 N.E.2d 1102.) Questions of fact that arise concerning whether or not intent has been shown are for the trial court to resolve. (*People v. Woods*, 62 Ill. App. 3d at 385, citing *People v. Mimms* (1976), 40 Ill. App. 3d 942, 353 N.E.2d 186.) Accordingly, we agree with the State that there is sufficient evidence beyond a reasonable doubt to sustain the conviction for the attempted murder

of Anthony Camphor. The evidence established beyond a reasonable doubt that Moten possessed the requisite specific intent to kill, and he did indeed kill Jackson and injure Abrams and Camphor.

Bailey's convictions are predicated on an accountability theory. A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such person in the planning or commission of the offense. (720 ILCS Ann. 5/5—2 (Michie 1993).) To sustain a conviction based upon an accountability theory, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the offense; (2) the defendant's participation took place before or during the commission of the offense; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the offense. (720 ILCS Ann. 5/5—2 (Michie 1993); *People v. Roppo* (1992), 234 Ill. App. 3d 116, 126, 599 N.E.2d 974, *appeal denied* (1992), 146 Ill. 2d 646, 602 N.E.2d 470.) Mere presence at the scene of a crime and knowledge that a crime is being committed are insufficient to establish guilt. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631; *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520; and *People v. MacFarland* (1992), 228 Ill. App. 3d 107, 122, 592 N.E.2d 471.) Evidence of conduct showing a design on the part of the defendant to aid in a crime renders the defendant accountable for the perpetrator's actions. *People v. Rodgers* (1978), 58 Ill. App. 3d 719, 374 N.E.2d 721; *People v. Schliq* (1983), 120 Ill. App. 3d 561, 458 N.E.2d 544.

When a defendant challenges his conviction based on the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49.) To prove that the defendant had the intent to promote or facilitate the crime, the State must establish beyond a reasonable doubt that the defendant showed the criminal intent of principal or was engaged in a common design. (*People v. Taylor* (1993), 244 Ill. App. 3d 152, 157-58, 614 N.E.2d 79; *People v. Stanciel* (1992), 153 Ill. 2d 218, 606 N.E.2d 1201; *People v. Schliq*, 120 Ill. App. 3d at 570.) Although the defendant does not have to actively participate in the overt act, mere presence at the scene, even with knowledge that the crime is being committed, is not sufficient to establish accountability for the actions of another. *People v. Taylor* (1993), 244 Ill. App. 3d 152, 158; *People v. Carrizales* (1992), 240 Ill. App. 3d 893, 608 N.E.2d 30, *appeal denied* (1993), 151 Ill. 2d 568, 616 N.E.2d 339.

●3 In Bailey's case, in viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The State has presented sufficient evidence to sustain a conviction based upon a theory of accountability for the shooting carried out by Moten and encouraged by Bailey: (1) the evidence shows that Bailey actively took part by soliciting, ordering, abetting, agreeing to, or attempting to aid another in the planning or commission of the shooting of Jackson, Abrams and Camphor by urging Moten to shoot; (2) the evidence shows that Bailey participated before and during the shooting, including shooting at Michael Thompson during the melee; and (3) the evidence shows that Bailey had the concurrent, general intent to promote or facilitate the shooting of the victims, by sharing the criminal intent of the principal, Moten. (*People v. Stanciel* (1992), 153 Ill. 2d 218.) Thus, the elements necessary to sustain a conviction based upon a theory of accountability are present.

Bailey cites to *People v. Parker* (1992), 234 Ill. App. 3d 273, 600 N.E.2d 529, *appeal denied* (1993), 148 Ill. 2d 650, 610 N.E.2d 1272, in support of his argument that his conviction, based upon prior inconsistent statements used as substantive evidence, must be reversed. In the case at bar, as in *Parker*, both witnesses recanted their earlier identification of defendant as the perpetrator of the offense. In *Parker*, the defendant was convicted of murder, armed violence, attempted murder and aggravated battery. All three witnesses were severely impeached by the witnesses' trial testimony, which exculpated defendant and cast doubt on the authenticity of the statements: (1) one witness testified that he signed the statement while recovering from surgery and was in great pain and he wanted to get rid of the detective who solicited the statement; (2) the second witness said he was told by Detective Lenzi Stewart that he would be arrested or prosecuted for withholding evidence if he refused to sign the statement because someone put him at the scene of the crime; and (3) the third witness said Detective Stewart coerced him into giving a statement by telling him he could be charged with robbing the dead. Bailey's argument that his case should be reversed, as in *Parker*, is not persuasive. The recantation by the witness in the instant case is distinguishable from the recantation of the witnesses in *Parker*.

●4 Unlike the witnesses in *Parker*, witness Thompson did not claim to be coerced into giving testimony and a motive to recant his prior grand jury testimony and other out-of-court statements was evident from facts established at trial. Thompson said he and Adams

had bargained for favors, from defense counsel William Swano, in exchange for giving exculpatory testimony for Moten and Bailey. Additionally, Thompson, who in the interim between the night of the shooting and the date of the trial had been successfully prosecuted by the State's Attorney and incarcerated for six years in the penitentiary, was now unhappy with the State and unwilling to testify to what he had previously described regarding the shootings of the night of May 8, 1987. The trial court, in weighing the evidence and assessing the credibility of the witnesses, which is the exclusive function of the trier of fact, determined that Thompson was telling the truth in his out-of-court statements and was lying at trial. The court drew a reasonable inference that the dissatisfaction with the State's Attorney provided a motive for the witness to recant his previous account of what happened. As previously stated, the court made a finding that "Thompson now has a motive to recant his earlier identification of defendants."

As part and parcel of his argument that the evidence is insufficient to establish his guilt beyond a reasonable doubt, Bailey urges this court to hold that prior inconsistent statements alone are insufficient as a matter of law. Our legislature, however, has seen fit, consistent with its legislative authority, to prescribe methods of proof and rules of evidence. Section 115—10.1 of the Code of Criminal Procedure (725 ILCS Ann. 5/115—10.1 (Michie 1993)) provides that under certain expressly enumerated circumstances, prior inconsistent statements can be utilized as substantive proof.

The legislature, in promulgating section 115—10.1 (725 ILCS Ann. 5/115—10.1 (Michie 1993)), provided that, in all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

"(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior

statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording."

Thompson made four statements prior to trial. The first three were made a few days after the shooting—one under oath at the grand jury hearing and the other two to the investigating officers. In addition, Detective Kelly testified during a *voir dire* examination that Thompson identified Bailey and Moten as the perpetrators of this offense; on February 15, while being prepped for testifying, Kelly stated that Thompson repeated the sequence of events as he had previously related them to the grand jury, to the police during the May interview and at the lineup. However, upon being called to the witness stand, he recanted all of the prior statements, indicating that it was too dark to see anything and stating that it was not Bailey who shouted "shoot him, shoot him."

The court, upon analysis of the factual matrix, determined that all of the out-of-court statements would be received, pursuant to the statute, as substantive evidence. While the court did not reject the jury room statement as substantive evidence, it did remark that it would not be given the same weight as the other three statements.

Thompson's out-of-court statements were inconsistent with his trial testimony. Thompson was present at court and was available for cross-examination by defense counsel; the statements related to events within his personal knowledge; and he acknowledged under oath that he made the pretrial statements.

Hence, we believe the court could have found Bailey guilty solely on the eyewitness testimony of a single witness, notwithstanding that such testimony occurred in another proceeding, to wit, before the grand jury. However, the trial court expressly stated that it considered the prior statements of Thompson and coupled with the testimony of Adams found it sufficient beyond a reasonable doubt. Although Adams equivocated at trial as to what he actually saw or did not see, certain aspects of his testimony corroborated Thompson's out-of-court statements. Both Adams and Thompson stated that they observed Bailey and Moten standing in the elevator area immediately preceding the shootings. Both witnesses stated that they saw Moten fire the shots, and both witnesses stated that they heard someone yell words of encouragement either before or during the shooting. In light of the fact that this evidence was received as substantive evidence, it was within the province of the fact finder to believe it or not to believe it.

Bailey next asserts that, assuming *arguendo* the State proved his presence at the shooting scene, he is still entitled to an acquittal since Adams' testimony on direct examination revealed that the words of encouragement to Moten occurred subsequent to the shooting. So Bailey contends that as a matter of law he would not be accountable. Section 5—2 of the Criminal Code of 1961 (720 ILCS Ann. 5/5—2 (Michie 1993)) provides that one is accountable for the criminal conduct of another when he or she urges and encourages criminal conduct of another either before or during the commission of the offense. Mere presence alone is insufficient to establish one's accountability for the commission of a crime. *People v. MacFarland*, 228 Ill. App. 3d at 122.

•5 Bailey seeks to characterize the words of encouragement as having occurred after the shooting took place. However, we are not limited to the testimony of Torrence Adams. Brandon Abrams' testimony reveals that whoever shouted "shoot" did so before the shooting occurred, even though he was unable to identify who uttered those words. Circumstantially, however, the trier of fact could consider this testimony as corroborative of the sequence of events. Additionally, if there are facts in the record that support an affirmance of the trial court, whether or not the trial court relied thereon, the review court may take them into consideration. (134 Ill. 2d R. 342(d); and *Denenberg v. Prudence Mutual Casualty Co.* (1970), 120 Ill. App. 2d 68, 256 N.E.2d 71.) Michael Thompson's out-of-court statements, before the grand jury and to the investigating officer on May 11, 1987, also revealed that the words of encouragement, to wit, "shoot him, shoot him," were shouted immediately preceding the volley of gunshots. Moreover, Thompson was able to and did identify the person who shouted those words as Hernandez Bailey and the person who turned around and fired shots as Darryl Moten. Thompson's May 11 version of what occurred on May 8, 1987, remained the same until he actually took the witness stand on February 15, 1989, at trial, where he recanted his testimony.

The record reflects that the scene was chaotic, multiple gunshots were fired by Moten, and three people were shot. As stated previously, Abrams testified that the words of encouragement were uttered immediately before the shooting took place, and while the court did not consider Abrams' testimony in determining the identity of the participants, it is corroborative of Thompson's pretrial statements with respect to the sequence of events. We believe the experienced trial judge correctly decided on the basis of the totality of the evidence before him that the State proved Bailey guilty of murder and attempted murder beyond a reasonable doubt on a theory of accountability.

Bailey's next argument is that he did not receive a fair trial due to the court's failure to consider evidence which impeached the testimony of Torrence Adams. The testimony at issue relates to whether or not Adams revealed to the police that "Peanut" was at the scene of the shooting. Adams insisted at trial that on the date of the lineup, May 11, 1987, he did tell an officer that "Peanut" was at the scene of the shooting. He could not, however, recall which officer he told this to and he spoke with five different police officers that day, including Detective Kelly. For the purpose of impeaching Adams, Bailey presented stipulated testimony in his case in chief that Detective Kelly would testify that Adams did not identify Bailey or "Peanut" to him. Bailey now contends that the court failed to fully consider the stipulated evidence which impeached Adams' testimony. Bailey tangentially raises in this connection a claim of ineffective assistance of counsel, arguing that the court misapprehended the import of the impeachment testimony because of defense counsel's inability to lay a proper foundation for its admission.

●6 We will address this dual issue by first discussing the ineffective assistance claim. Specifically, Bailey's position is that counsel was confused as to the date on which Adams spoke to Detective Kelly and consequently failed to lay a clear foundation, which resulted in the court's failure to gain the full import and fully consider the impeachment testimony. Bailey's argument is based upon his view that an inadequate foundation was laid for the admission of the impeachment testimony. What the defense fails to recognize is that the testimony was in fact received into evidence. Had the foundation not been proper, it would not have been admitted. Because it was in fact admitted, we have difficulty in finding merit to the ineffective assistance of counsel argument.

Under *Strickland v. Washington* (1983), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which Illinois has adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, in order to prevail on such a claim, a defendant must meet a two-prong test: (1) whether counsel's performance was so seriously deficient that it fell below an objective standard of reasonableness under the prevailing professional norms; and (2) whether defendant was denied a fair trial as a result of counsel's deficient performance. In applying this two-component standard, " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527, quoting *Strickland*, 466 U.S. at 699, 80 L. Ed. 2d at 699, 109 S. Ct. at 2069-70.

Bailey submits that the court's incomplete consideration of the evidence resulted in extreme prejudice and entitles him to a new trial. We disagree. Our review of the record on appeal demonstrates that counsel did lay the foundation resulting in the admission of the impeachment testimony. Because the evidence was received into evidence, we fail to discern any prejudice to Bailey.

With respect to whether the court fully considered the impeachment evidence, as the fact finder, it is within the exclusive province of the trial court to weigh the credibility of the witnesses and assess said credibility. The court reviewed the impeachment evidence and weighed it in accordance with the totality of the witness' inability to remember the name or identity of the officer to whom he supposedly gave this information. Adams' testimony revealed that he spoke with a number of officers, approximately five, only one of whom was Detective Kelly. The fact that Kelly was not the one to whom this information was given is not necessarily impeachment. While the record does not reflect that the court ignored this evidence, it appears to have determined that its value was diminished in light of Adams' faded recollection. Hence, we find no indication that Bailey was deprived of a fair trial by virtue of the court's refusal to give the impeachment evidence considerable weight.

The next argument raised by Bailey is that he was denied a fair trial where he objected to the State's argument, which implied witness intimidation of Thompson, and the court overruled the objection. At the conclusion of the State's case in chief, Bailey moved for a directed finding. The State argued that the court should take into account what happens in jail when a witness and an accused are both incarcerated and when they are both members of a gang. The State sought to draw an inference and thereby provide an explanation for why Thompson changed his testimony a day or two before trial. Never during this argument, however, did the State use the word "intimidation." It appears that defense counsel assumed that the State was referring to intimidation.

●7 Initially, the State posits that this issue has been waived for failure of defendant to include the objection in a post-trial motion in order to preserve the issue for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) However, this court may, pursuant to Supreme Court Rule 615(a), take notice of plain error or defects affecting substantial rights even though such errors were not brought to the attention of the trial court. Under the circumstances of this case, we agree that the issue has been waived, and we decline to invoke the plain error doctrine. *People v. Johnson* (1991), 214 Ill. App. 3d 1087, 574 N.E.2d 225, *appeal denied* (1991), 141 Ill. 2d 551, 580 N.E.2d 125.

Lastly, Bailey contends that the evidence regarding a conversation between Thompson and the assistant State's Attorney, right before trial, was given improper consideration by the court as substantive evidence. Immediately preceding the trial, Thompson was placed in the jury room adjacent to the courtroom. Present with him were the other two State witnesses, Adams and Abrams, the investigator, Detective Kelly and the trial assistant State's Attorney. According to Detective Kelly's *voir dire* testimony, he overheard Thompson tell the assistant State's Attorney that on May 8, 1987, he heard Bailey tell Moten to shoot and he saw Moten fire the fatal shots. Kelly's *voir dire* testimony, originally elicited to determine if Thompson should be declared a hostile witness, was subsequently stipulated to by the parties as evidence in the State's case in chief.

•8 At trial, however, Thompson was asked whether he had made the statement attributed to him in the jury room. His reply was "yes, yes—I think so." The State first contends that the statement was admissible under section 115—10.1 of the Code of Criminal Procedure (725 ILCS Ann. 5/115—10.1 (Michie 1993)). The statute provides, *inter alia*, that a witness' out-of-court statements are admissible as substantive evidence if they are (1) inconsistent with that witness' trial testimony; (2) the witness is subject to cross-examination; (3) the statements relate to an event within the witness' personal knowledge; and (4) the witness acknowledges under oath making the statements. (*People v. Hastings* (1987), 161 Ill. App. 3d 714, 719, 515 N.E.2d 260.) Bailey counters by characterizing Thompson's response as equivocal and therefore only admissible as impeachment. It is this theory upon which Bailey premises the assertion that the court erred by using the statement to bolster the other out-of-court statements. After carefully perusing the record, we find nothing therein to suggest that the court did not receive the evidence as substantive evidence. The court indicated that any statement made where the witness was not equivocal would be considered as substantive evidence. Thompson did, however, respond that he was not sure that he said Moten was the shooter. Consequently, it would appear that that portion of the statement could only be used for impeachment. Based upon Thompson's response of "yes, yes—I think so" to the question of whether or not he repeated his accusation against Bailey while in the jury room shortly before trial, we cannot say that the court erred.

Bailey's argument appears, once again, to be a challenge to the weight accorded the statement by the fact finder. As this court has repeatedly held, the weight to be accorded testimony is within the exclusive province of the trial court and we see no reason to overturn

the court's decision, nor do we believe we have the authority to do so absent arbitrariness or abuse of discretion by the trial court. (*People v. Fields* (1990), 135 Ill. 2d 18, 43, 552 N.E.2d 791.) Accordingly, for all of the foregoing reasons, we reject Bailey's arguments.

The final issue is whether Moten's sentencing was excessive and should be reduced or the cause remanded for a new sentencing hearing. Moten contends that his sentence for murder was excessive and should be reduced or the cause remanded.

At the sentencing hearing, in aggravation, the State argued that Moten had been a gang member since he was seven years old. As a juvenile, he was adjudicated delinquent for residential burglary and armed robbery and was sent to the Juvenile Division of the Department of Corrections. The State also relied upon the facts of the case.

In mitigation, defense counsel argued that Moten was a product of his environment and had no alternative but to join a gang when he was seven years old. When he was released from the juvenile division, he returned to his same friends. Counsel also said defendant was only 20 years old and had taken some General Education Diploma (GED) classes while in juvenile custody. Defendant did not make a statement to the court.

Where the sentence imposed is within the statutory limits, a reviewing court will not exercise its power to reduce a sentence absent an abuse of discretion. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708.) An appellate court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently had the task of sentencing been charged to it. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

●9 Moten was found guilty of murder in violation of section 9—1(a)(1) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and attempted murder in violation of section 8—4(a) (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a)). The statutory sentencing range for murder at that time was 20 to 40 years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)) and for attempted murder, which is a Class X felony, the sentence shall be not less than 6 years and not more than 30 years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3)). Moten was sentenced to 35 years' imprisonment for murder and a concurrent 10-year term for attempted murder. This sentence falls clearly within the statutory range. Moten has pointed to nothing to indicate that the court did not consider the evidence at trial, the presentence report as well as the factors presented in aggravation and mitigation. Moten provides no basis for us to determine that the trial court abused its discretion.

Accordingly, the judgment of the circuit court of Cook County is affirmed as to the convictions and sentences of Moten. The judgment of the circuit court of Cook County is affirmed as to the conviction of Bailey.

Judgments affirmed.

BUCKLEY and O'CONNOR, JJ., concur.