THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWIGHT F. WEST, Defendant-Appellant.

Fifth District   No. 5—96—0095

Opinion filed February 20, 1998.—Rehearing denied March 17, 1998.

WELCH, P.J., dissenting.

Harold K. Pike III, of Centralia, for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Robert K. Villa, Assistant Attorneys General, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

On August 8, 1990, a fire destroyed the Fash-n-Fab buildings owned by defendant Dwight West. A firefighter was injured while attempting to extinguish the blaze. Following a bench trial, defendant was convicted of five counts of arson and one count of aggravated arson, and he was sentenced to four and six years' imprisonment on the respective charges. Defendant argues that: (1) the court erred in admitting into evidence photographs of the crime scene; (2) the court's findings of fact are not supported by the evidence; and (3) the court improperly conducted deliberations prior to defendant resting his case. We affirm.

Defendant's first argument is that the court erred in admitting crime-scene photographs taken on August 13 and 14, 1990. These photographs, marked as People's exhibits Nos. 12 to 56, primarily depicted the floors of the Fash-n-Fab buildings. Defendant argues that it was improper to admit these photographs because the State failed to lay a proper foundation for their introduction. Defendant argues that no evidence was produced as to the condition of the floors subsequent to the August 8, 1990, fire and that the court therefore erred in allowing them into evidence. The State argues that defendant waived this argument because he failed to object in a timely manner. Before addressing the substance of defendant's argument, we will address the waiver issue.

■ In general, to preserve an issue for review, a defendant must object at trial and include the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). In this case, defendant did object during trial to the use of the photographs marked as People's exhibits Nos. 12 to 56, and he objected in a post-

trial motion. The State argues that defendant's objection at trial was not made the first time the photographs were identified and that therefore it was untimely.

The issue is not whether a party objects to evidence when it is first identified or referred to, but the issue is instead whether an objection is made when the evidence is offered. In this case, defendant did object to the photographs at trial, both while they were being referred to by various witnesses and when they were offered into evidence. In addition, in a timely posttrial motion defendant objected to the use of the photographs. Under these circumstances, we find that defendant did not waive this issue on review.

We now turn to defendant's first argument, that the court erred in admitting People's exhibits Nos. 12 to 56, photographs of the crime-scene floor. Defendant argues that no proper foundation was laid for their admission.

■ In general, a photograph is admissible into evidence if it is identified by a witness who has personal knowledge of the photographed subject and testifies that the photograph is a fair and accurate representation of the subject at the relevant time. *Casson v. Nash*, 54 Ill. App. 3d 783, 795, 370 N.E.2d 564, 573 (1977), *aff'd*, 74 Ill. 2d 164, 384 N.E.2d 365 (1978). A decision to admit photographic evidence is within the trial court's discretion and will not be reversed absent an abuse of discretion. *People v. Greer*, 79 Ill. 2d 103, 117, 402 N.E.2d 203, 209 (1980).

In this case, Kim May, an investigator with State Farm Insurance Company, was called to the scene of the fire on August 10, 1990, two days after the fire. May returned to the site on August 13 and 14, 1990. During his investigation of the fire and the excavation of the Fash-n-Fab buildings, May took the photographs. May testified that the photographs, taken on August 13, 1990, fairly and accurately depicted the scene as he observed it on August 10, 13, and 14, 1990.

■ Defendant argues that the State did not show that the unsecured crime scene had not been tampered with prior to May's examination of the site on August 10. In considering this argument after defendant's objection, the court noted:

"May saw the premises on Friday the 10th, for the first time ***. Then he came back on Monday the 13th and was there again on the 14th. Photographs were taken. You have through cross[-]examination elicited the fact from various witnesses that the premises were not secured in any way nor could they have been [and] that there were no guards there except for the suggestion perhaps from one witness that there might have been a yellow tape around the premises. Others have said they were not aware

of any. It's true that the testimony has been from \*\*\* May that debris was removed from the premises [and] that the washing down was made to determine burn patterns. Now, you are suggesting that an improper foundation has been laid because the State has failed to negate the possibility of any other person other than those who have testified as being upon the premises.

First, with reference to the burn patterns and burned areas of the various structures, it can hardly be suggested, I think, that there has been a change or moving of the structure that remains standing after the fire and the intense heat. It's true that there is a possibility that certain objects burned [and that] objects that might have been in the debris on the floor and remained may have been moved from time to time by walking or posing, but I don't think that there is sufficient basis for this Court to hold that no foundation has been laid for the use of these photographs \*\*\*."

We hold that the court thoroughly considered this issue and correctly found that a proper foundation had been laid for the photographs. May testified that they were fair and accurate representations of what he and the fire chief saw as they inspected the building soon after the fire. The fire occurred on August 8, 1990, around 5:30 p.m. Fire Chief Roger Sutherland testified that the fire was brought under control within 45 minutes to one hour but that it took three to four hours to extinguish it completely. The investigation of the building was suspended until August 9, due to darkness. On August 9, Chief Sutherland returned to the scene and attempted to remove debris from the building, but due to the amount of the debris, he elected to suspend operations until August 10, when State Farm Insurance investigators could assist him. There was nothing to contradict May's testimony that the photographs were fair and accurate depictions of the building as he had observed it on August 10, 13, and 14.

The fact that the photographs were taken two days after the fire, rather than immediately after the fire, goes to the weight of the evidence, not its admissibility. *Burke v. Toledo, Peoria & Western R.R. Co.*, 148 Ill. App. 3d 208, 213-14, 498 N.E.2d 682, 686 (1986); see also *Illinois State Toll Highway Authority v. Grand Mandarin Restaurant, Inc.*, 189 Ill. App. 3d 355, 360, 544 N.E.2d 1145, 1148 (1989). In this case, it was explained that due to the extensive damage it was impossible to excavate and take the photos immediately after the fire. The absence of any showing or strong suggestion that there was any tampering to the areas depicted in the photographs leads us to conclude that the court did not err in admitting them. See *Burke*, 148 Ill. App. 3d 208, 498 N.E.2d 682.

In bench trials, judges are only to consider the proper evidence.

*People v. Todd*, 154 Ill. 2d 57, 69, 607 N.E.2d 1189, 1195 (1992). In this case, during cross-examination, defendant's counsel repeatedly pointed out problems with the photographs, problems which defendant argues rendered the photographs inadmissible. The lack of weight that should have been afforded the photographs, according to defendant, was therefore brought to the court's attention. We, therefore, affirm the court's finding that the State laid a proper foundation for People's exhibits Nos. 12 to 56.

Defendant's second argument is that the court's findings of fact are not supported by the evidence. Defendant argues that the court erred in giving more credibility to the testimony of witness Curt Swartzlander than to that of witnesses Chris Connaway and John Nelson. Defendant also argues that the court erred in accepting at face value the testimony of the State's expert Clyde Goin, because his investigation of the fire occurred more than four years after the fire.

■ A reviewing court may disturb the trial court's finding as to credibility only when the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. *People v. Bailey*, 265 Ill. App. 3d 262, 271, 638 N.E.2d 192, 198 (1994). A reviewing court will not substitute its judgment for that of the trial court when the evidence is merely conflicting. *Bailey*, 265 Ill. App. 3d at 271, 638 N.E.2d at 198. In a bench trial, to resolve any conflicts in the evidence, the trial judge must determine the credibility of witnesses, weigh the evidence, and draw reasonable inferences therefrom. *Bailey*, 265 Ill. App. 3d at 271-72, 638 N.E.2d at 198. In a challenge to the sufficiency of the evidence, the function of the reviewing court is not to retry a defendant but rather to carefully examine the evidence, considering the fact that the trier of fact observed the witnesses firsthand. *Bailey*, 265 Ill. App. 3d at 271-72, 638 N.E.2d at 198.

Curt Swartzlander testified that on August 8, 1990, sometime between noon and 5 p.m., he noticed that the sky was full of black smoke from one of the Fash-n-Fab buildings. Swartzlander, a trained volunteer fireman, testified that as he turned into the parking lot, a light tan or brown Buick car was coming out of the parking lot. Swartzlander testified that he assumed that the driver was going to call the fire department, and he kept an eye on the driver to ensure that was done. According to Swartzlander, the driver pulled into the Country Fair Store parking lot and entered the store. A few minutes later the fire department came to the scene.

Swartzlander testified that once he saw the driver enter the store, Swartzlander walked around the north Fash-n-Fab building. He testified that he was unable to see in the building, however, because the entire building was full of smoke. Swartzlander testified that he could not see any flames, only black smoke.

Swartzlander testified that shortly after the fire department arrived, defendant approached him and introduced himself as Mr. West. They spoke briefly about the fire, and Swartzlander expressed concern that someone might be inside. Swartzlander testified that defendant told him that the fire happened right at closing time. Swartzlander testified that he asked defendant if he was the driver of the Buick that had previously pulled out of the Fash-n-Fab parking lot into the Country Fair parking lot, and defendant said that he was.

On cross-examination, Swartzlander admitted that he was not sure about the time when he first saw the smoke and saw defendant's car leaving the Fash-n-Fab parking lot. Swartzlander testified that the sun was in the west, getting ready to set, when he first helped the fire department put out the fire. Chris Connaway testified that on August 8, 1990, he worked for a car dealership about one block from the scene of the fire. Connaway was familiar with defendant prior to the fire and in fact had sold him the tan car he was driving the day of the fire. Connaway testified that at about 5:25 p.m. he drove past the Fash-n-Fab and noticed defendant's car alone in the parking lot but did not see any smoke or fire. Connaway testified that 5 to 10 minutes later he drove past the building again and noticed that defendant's car was gone. Connaway testified that he saw no other cars in the parking lot and that he did not see any smoke or flames coming from the buildings.

John Nelson testified that he lived about 250 to 300 feet from the Fash-n-Fab buildings. Nelson testified that on August 8, 1990, he drove past the buildings about 5:30 p.m. According to Nelson, as he drove past the buildings, he observed grey smoke coming out of a vent in the center building. Nelson testified that he drove home, alerted the police department about the fire, and then drove back to the Fash-n-Fab. Nelson was concerned that someone was in the building, because it was closing time.

Nelson testified that upon his return to the fire scene he looked into the north building but did not see any smoke. Nelson testified that he could see through the breezeway and saw "flickering" in another building. Nelson testified that he did not see actual flames, only a flicker, "like light flashing on the wall."

Nelson testified that he saw a car drive into the parking lot and he saw an upset man, later determined to be defendant, get out of the car. Nelson testified that he yelled to defendant not to go into the buildings. Sometime later the fire department arrived on the scene.

In reviewing the facts of the case before making its ruling, the court stated:

"Now, Mr. Swartzlander, it's true he wasn't too sure, and as Mr.

Pike said on his direct examination[,] he wasn't too sure about the time. It may have been early in the afternoon when this occurred but that doesn't detract from the fact that it can be without doubt that he was there. He was on the scene. He saw the fire being fought by the fire fighters. He assisted immediately in fighting the fire when he arrived. He also had training in that area. Now, it's argued by defense counsel that the [testimony] of Mr. Swartzlander should be considered incredible by this Court as trier of fact because from some of the time frame there may be some differences in the testimony of the Nelsons and the car salesman and Mr. Swartzlander. However, with the testimony that I have just recounted[,] we are pretty well locked into a time frame in this case."

We hold that the court's findings of fact are supported by the evidence. The resolution of any conflict in witnesses' testimony is the function of the trial court. *People v. Hill*, 272 Ill. App. 3d 597, 603, 650 N.E.2d 558, 564 (1995). When faced with contradictory evidence, reviewing courts will not substitute their assessment of the credibility of the witnesses for that of the trial judge, because the judge stands in the best position to weigh the credibility of all of the witnesses. *Hill*, 272 Ill. App. 3d at 604, 650 N.E.2d at 564.

In this case, the court believed Swartzlander's testimony that he saw defendant leave the Fash-n-Fab parking lot as smoke was seeping out of the building. The court found that the fact that Swartzlander did not know the exact time when this occurred was of little substance, because the time frame had been established by other witnesses. Even Swartzlander testified that defendant told him the fire started about the company's closing time. We hold that the court's findings of fact were supported by the evidence and were, therefore, not manifestly erroneous. *Hill*, 272 Ill. App. 3d 597, 650 N.E.2d 558.

Defendant's final argument is that the court improperly conducted deliberations prior to defendant resting his case. The State argues that defendant has waived this argument by failing to object at trial. In general, to preserve an issue for review, a defendant must object at trial and include the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). In this case, defendant did raise this issue in his posttrial motion, but he had failed to raise the issue at trial. We give great weight to the fact that this was a bench trial. We can understand why, during the closing moments of the trial before the court rendered its decision, defendant's counsel did not want to raise an issue regarding the court's comments. We would not expect, or require, a party to take that risk. We note that defendant did raise the issue at the first opportune mo-

ment, that being in his posttrial motion. We, therefore, do not find that defendant waived this argument.

■ Defendant argues that the court deliberated prior to the close of defendant's case and, therefore, failed to keep an open mind until all of the evidence had been presented. Defendant points to the court's remarks following the close of the case:

> "I hasten to advise all of you that this Court has taken copious notes during the course of the trial. I am into the tenth yellow pad here today and it's my practice, and it was followed in this case, to review the evidence as we go along, and I can tell you that this weekend I spent literally seven hours at least in going through my notes in this case in addition to looking at exhibits, and I can assure you that this case was not far from my mind during any part of the weekend since we parted company Friday evening. So I say that simply so those who might be in attendance think that the Court maybe would take this case under advisement for a period of time before ruling, and I want you to know that I have in essence done that."

The State points out that following the passage highlighted by defendant, the court continued, acknowledging, "There was very little evidence introduced here today that wasn't before the Court on Friday." After a detailed analysis of the facts, the court found defendant guilty of five counts of arson and one count of aggravated arson.

A defendant has a constitutional right to an unbiased, open-minded trier of fact. *People v. Johnson*, 199 Ill. App. 3d 798, 806, 557 N.E.2d 565, 570 (1990). "Pre-judgment is the antithesis of a fair trial" because a defendant is entitled to a fair and impartial trial before a court which does not render judgment until after trial. *Johnson*, 199 Ill. App. 3d at 806, 557 N.E.2d at 570, citing *People v. McDaniels*, 144 Ill. App. 3d 459, 462, 494 N.E.2d 1275, 1278 (1986). In order to show bias or prejudice by the court, however, the record must show that there was an active personal animosity, hostility, ill will, or distrust toward the defendant. *Johnson*, 199 Ill. App. 3d at 806, 557 N.E.2d at 570. That is not the case here.

In this case, the court stated that it had been reviewing its voluminous notes as the trial progressed, rather than waiting until the end of trial to begin reviewing them. The court did not state and did not give any indication, prior to the close of the case, that it had made any decision as to defendant's guilt. We therefore hold that the court did not err in reviewing its notes prior to the close of the case. Indeed, we find that the court's actions were diligent and proper.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HOPKINS, J., concurs.

PRESIDING JUSTICE WELCH, dissenting:

I dissent because I find that, even viewing all the evidence in the light most favorable to the prosecution, as I must, no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Moore*, 171 Ill. 2d 74, 95 (1996). The State has failed to present sufficient satisfactory evidence not only that the fire in this case was intentionally set with gasoline serving as an incendiary agent but that it was set by the defendant.

The State posits that the fire was intentionally set with gasoline. The record contains no eyewitness testimony concerning the cause and origin of the fire. Numerous wood, tile, and carpet samples taken from various locations in the buildings were subjected to laboratory analysis that proved negative for the presence of gasoline. No gasoline containers or other vessels suitable for the storage and application of accelerants were found at the fire scene. Therefore, the State had to rely exclusively on expert testimony to prove its case. Chief among the State's expert witnesses was Clyde Goin, an arson investigator employed by the office of the Illinois State Fire Marshall, who opined that the fire had multiple origins in the north, middle, and south buildings and was caused by a poured accelerant consisting of between one quart and one gallon of gasoline in the north building, one-half gallon to two gallons of gasoline in the middle building, and one quart of gasoline in the south building.

Neither party quarrels with Goin's general expertise in the field of arson investigation, nor do I. What I do quarrel with, and what the record bears out, is the inadequate investigative technique Goin employed in reaching his conclusions. Goin acknowledged on cross-examination that before settling on a poured accelerant as the cause of a fire, a prudent arson investigator must eliminate all other causes by taking into account such factors as the effects of flashover, air flow, hot gases, melted plastics, and building collapse. Yet in formulating his conclusions, Goin was unaware of and did not take into account the following: the building contents and their locations, the manner in which the fire debris was excavated from the buildings, the fire loads of the buildings, the composition of the roofing material that collapsed in the middle building, the condition of the

buildings' electrical systems, the condition of the buildings' natural gas systems, the composition of the ceilings in the north and middle buildings, the contents of the attic in the middle building, the contents stored above the mezzanine in the south building, whether there was padding under the carpeting and, if so, the composition of the padding, whether the windows were open or closed at the time of the fire, the specific type of tongue-and-groove wood flooring in the middle building, and the ignition temperatures of specific types of plastics.

Several days after the fire, two insurance investigators and two local firemen acting as laborers excavated the fire scene by removing large debris from the buildings. Next, they shoveled away the smaller debris by hand. Finally, the buildings were subjected to a high-pressure fire hose that washed out any remaining debris. The photographs marked as People's exhibits Nos. 12 to 56, upon which Goin relied, were taken during this process. Goin testified that various burn patterns depicted in these photographs were caused by the ignition of poured gasoline. This testimony is flawed, however, because Goin did not take into account and eliminate other factors that could have influenced the shape, size, and direction of the observable burn patterns on the carpeting and flooring. Objects such as tables and display cases, for example, located in the buildings could have shielded or deflected radiant heat, leaving the carpeting or flooring below them free of charring or fire damage. Falldown could have caused some of the burn patterns. The middle roof, for example, collapsed into the building, bringing with it petroleum-based asphalt roofing shingles that can liquefy under intense heat and burn. The evidence established that many items for retail sale located in the buildings had plastic components or were packed with plastic or styrofoam. These substances may have melted and pooled on the floor due to the hot fire, thereby creating or influencing burn patterns. Finally, the burn patterns could have been influenced by the excavation techniques used by the insurance investigators, who used shovels to scrape away debris, including carpeting and padding, down to bare floor. The size and shape of the burn patterns represented in the photographs would not necessarily have mirrored their actual size and shape before the excavation process began.

Goin acknowledged on cross-examination that a poured accelerant when ignited will leave a doughnut-shaped burn area. This is because the edge of the accelerant pool burns hotter where its vapors meet with oxygen, while the middle of the pool is cooled by the accelerant. Nevertheless, Goin opined that a poured accelerant was responsible for a burn pattern found on the floor of the middle build-

ing, even though the charring was heaviest at the center of the pattern. Indeed, Goin did not testify to the existence of any doughnut-shaped burn patterns in any of the three buildings.

Goin testified that the top of the mezzanine fire in the south building was the product of an ignited accelerant. This conclusion was based on observations of burn patterns on the top of the mezzanine. Significantly, Goin did not point to any doughnut-shaped burn patterns in support of this conclusion. Defendant, on the other hand, argued that the mezzanine fire resulted from flashover of very hot gases and flux that migrated through conduction from the middle building to the south building and collected in its ceiling area, only to ignite when a vent hole that was cut in the south building allowed the infusion of oxygen. Fireman William Thouvenin attributed flames coming out of a vent hole he cut in the south building to the ignition of heated gases mixing with the oxygen source created by the vent hole. The resulting fire burned up boxes, business records, and other items that were stored on the top of the mezzanine, thereby causing the burn patterns that Goin attributed to gasoline. Defendant's theory finds support from People's exhibit No. 7, which shows dark smoke rolling out of a vent on the roof of the south building at a time when the middle building was undergoing full room involvement, and People's exhibit No. 16, which shows a uniform scorching or burn pattern along the entire peak of the south building's roof.

Another troubling aspect of this case is the absence of any evidence of gasoline on the premises or on defendant's person. Numerous building samples collected for laboratory analysis proved negative for gasoline. More telling, the State did not produce any witness who could testify to the smell of gasoline on the premises or on defendant's person. This latter omission is particularly important given the large amounts of accelerants defendant is accused of pouring in a relatively short time frame. Terrell Moshbarger, who entered the store at 5:25 p.m. to ask defendant about an automobile that was for sale, testified that he did not smell gasoline. Curt Swartzlander, a trained firefighter and one of the first persons on the fire scene, spoke with defendant at the fire scene. He too made no mention of the smell of gasoline on defendant's person. Assuming that defendant had poured with great haste approximately three gallons of gasoline throughout the three buildings in the few minutes available to him between the closing of his store and the arrival of the fire department, it is truly remarkable that he was able to do so without acquiring even a whisper of the scent of gasoline on his clothing or person. Moreover, if gasoline were used in the quantities suggested by Goin, then ignition would have been instantaneous and the buildings would

have exploded, according to defendant's expert, Charles Hoffman. Where was the explosion?

For the foregoing reasons, I must respectfully dissent.