THIRD DIVISION
June 29, 2007

No. 1-04-3835

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 87 CR 06369 |
| | ) | |
| HERNANDEZ BAILEY, | ) | Honorable |
| | ) | James R. Epstein, |
| Defendant-Appellee. | ) | Judge Presiding. |

　　　　　PRESIDING JUSTICE THEIS delivered the opinion of the court:

Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 1994)), the trial court granted defendant's request for a new trial based on ineffective assistance of trial counsel. The State now appeals, contending that the grant of a new trial was manifestly erroneous. Specifically, the State argues that: (1) defendant failed to prove that his trial counsel was ineffective in failing to file a written pretrial discovery motion, failing to impeach an eyewitness with certain grand jury testimony, or failing to recognize that his dual representation created an actual conflict of interest, and (2) the circuit court relied on improper evidence from outside the record in making credibility determination with respect to trial counsel. For the following reasons, we reverse the judgment of the circuit court.

1-04-3835

BACKGROUND

On May 8, 1987, Anthony Jackson was fatally shot, and Brandon Abrams and Anthony Camphor were shot and injured during a melee occurring near an elevator on the ground level of a Chicago Housing Authority building at 4101 South Federal Street in Chicago. At trial, Abrams, as well as two other eyewitnesses, Michael Thompson and Torrence Adams, testified on behalf of the State. Defendant and codefendant Darryl Moten were both represented by privately retained attorneys William Swano, Abbey Fishman, and Edward Stern in a joint bench trial. This was a capital murder case for defendant as he had a prior murder conviction. The State's theory of the case was that Moten was the shooter and that defendant was liable under an accountability theory. Defendant was ultimately convicted of first degree murder and two counts of attempted murder and was sentenced to life imprisonment on the murder conviction and concurrent ten-year prison terms on the two counts of attempted murder.

The following relevant evidence was adduced from the record on appeal. At trial, Brandon Abrams testified that on May 8, 1987, he observed a man throw a brick at a group of people and Abrams and Camphor chased the man to the elevator area at 4101 South Federal. Abrams observed about ten people standing around, including Thompson and Adams. Abrams asked whether they saw where the man who threw the brick had gone. Someone replied, "there they go." Next, Abrams heard someone say "shoot them marks." Abrams then stated that a lot of people were shooting and that he and Jackson got shot. Abrams was unable to identify the shooter or the person who uttered the words "shoot them marks," although he said that the gunshots came from the group standing in front of the elevator. He also admitted that he and

Camphor were members of the Vice Lords gang.

Torrence Adams testified that on the night of May 8, 1987, he and Thompson were returning from a liquor store and as they walked through the elevator area of 4101 South Federal, they saw a group of people standing around, including four people associated with the Gangster Disciples street gang. Adams recognized defendant and codefendant Moten as two of those four people. Adams stated that he had known codefendant Moten for five years and did not personally know defendant, but had heard of and had seen him on the street once or twice and knew he went by the nickname "Peanut."

As Adams and Thompson left the elevator area, they saw two men run by the area followed by a third person. Adams identified the first two men as "Brandon" and "Ant." One of the men asked Adams if he knew the man who had run through the area, and Adams tried to signal to the men "to look over there," but the others did not understand. At this time, a fourth man, who was not wearing a shirt, ran to the area and stooped to tie his shoe. Adams testified that codefendant Moten turned around and fired a gun and that defendant said "shoot." As Adams ran away, he saw the man without the shirt fall to the ground.

On cross-examination, Adams equivocated, stating that although he saw defendant there, he did not know if defendant was the person who said, "shoot." Adams further testified that he was interviewed by police offers after being placed in a lineup on May 11, 1987. When asked on cross-examination whether he told Detective Kelly that Moten was involved in the shooting and that he saw "Peanut" at the scene of the shooting, Adams insisted at trial that he had told the officers that information, but was unable to remember the name of the officer with whom he had

spoken.

Next, Thompson testified that at the time of trial, he was serving a six year prison sentence for aggravated battery. He had known defendant his whole life and had also known codefendant Moten. On May 8, 1987, he was with Adams a little before 11 p.m. When they arrived at 4101 South Federal, they saw a large number of people near the elevator at the center of the building. When Thompson walked out of the building, some guys came through talking to each other. Thompson testified that a man standing by the wall near the elevator then turned around and shot one of the men. At trial, Thompson testified that he could not identify the shooter because it was dark.

The State moved to have Thompson declared a hostile witness based upon his earlier statements to a police officer and a statement made to the prosecutor the day before his testimony. In that statement, he referenced his grand jury testimony in which he identified codefendant Moten and defendant as participants in the shooting. The prosecutor informed the court that she was not aware of any grand jury transcript of Thompson, but that she would check the records. Specifically, she indicated to the court that the testimony upon which the grand jury returned an indictment had already been tendered to the defense. In addition to that statement, the prosecutor indicated to the court that:

> "there was evidently testimony that was brought out under a John Doe transcript
>
> prior to the Indictment, the actual Indictment. If that is the case, we are both
>
> entitled to have it and I don't physically have it."

Defense counsel acknowledged that he had been tendered a grand jury transcript by the State, but

indicated that the transcript did not include testimony from Thompson. It also became apparent that defense counsel had not filed a written motion for pretrial discovery, but that the State had filed an answer. The prosecutor indicated to the court that, "the answer that we filed said that the [grand jury testimony] would be made available upon being received by the People and we don't have it."

After a continuance, it became apparent that Thompson and Adams had indeed previously testified before the grand jury in a "John Doe Investigation" prior to its returning an indictment. The prosecutor tendered a copy of that transcript to defense counsel and defense counsel acknowledged receipt of that on the record. The transcript included the grand jury testimony from both Thompson and Adams.

The State also called Detective Thomas Kelly for the purpose of *voir dire* to determine whether Thompson could be declared a hostile witness. Detective Kelly testified in *voir dire* that on May 11 and 12, 1987, he interviewed Thompson regarding the death of Jackson and the attempted murder of Abrams and Camphor. Thompson told him that he heard defendant say "shoot him, shoot him" and told him that he saw Moten shoot Jackson. Detective Kelly also testified that just prior to trial, he was present in the jury room for a conversation that Thompson had with the Assistant State's Attorney. During that conversation, he heard Thompson state that codefendant Moten shot Jackson and that he heard defendant say, "shoot him, shoot him." The court then declared Thompson a hostile witness.

When Thompson resumed the witness stand, he again indicated that he was not sure who fired the gun because it was dark. Nevertheless, he admitted that he told the police on May 11,

1987, that he saw and heard defendant say "shoot him, shoot him," and he then saw codefendant Moten pull a gun from his waistband and shoot Jackson. He further acknowledged that he testified in the same manner before the grand jury. Additionally, he admitted that on May 12, 1987, he identified defendant in a lineup as the person who shot at him six times and as the person who told codefendant Moten, "shoot him, shoot him." With respect to the statements made in the jury room to the prosecutor, Thompson testified that he was not sure if he said that codefendant Moten was the shooter. As to whether he stated that defendant told codefendant Moten to "shoot him, shoot him," Thompson stated, "I think --yes, yes, I think so."

At the conclusion of the State's case-in-chief, the trial court admitted as substantive evidence both Thompson's grand jury testimony and statements made to police officers on May 11, 1987. In his grand jury testimony, Thompson indicated that he saw codefendant Moten reach into his waistband, pull out a revolver and shoot at Jackson, that defendant told codefendant Moten to "hit him," and that codefendant Moten then shot Jackson in the stomach. Thompson also testified that he told police the same story he told the grand jury.

The parties then stipulated that if Detective Kelly were called as a witness, he would testify consistently with his *voir dire* testimony. Additionally, the parties stipulated to the testimony of Detective Grady regarding the lineup and Thompson's identification of defendant as the person he heard say "shoot him, shoot him." A motion for a directed finding was denied as to both defendants.

The defense proceeded by way of stipulation. The parties stipulated that if Detective Kelly were called to testify, he would state that on May 11, 1987, he interviewed Adams in a

lineup. At no time during that interview did Adams mention to him that defendant or "Peanut" was present at the scene of the shooting or that Adams heard defendant or "Peanut" tell anyone to "shoot, shoot." It was also stipulated that if Victoria Ondriska were called to testify, she would state that on May 13, 1987, she was working as an Official Court Reporter assigned to the Cook County grand jury, that Adams was a witness before the grand jury, and during the course of his testimony, at no time did he mention that defendant or "Peanut" was present at the scene of the shooting.

The trial court found that Adams made an "excellent" identification and testified "convincingly." The court indicated that "it's not as though it is a first time, that he sees the defendants for the first time." With respect to Thompson's testimony, the court found that although Thompson testified at trial that he could not identify anyone, the court assigned weight to his statements to the police and the grand jury, and stated that he had a motive to recant his earlier identification of defendants as the perpetrators due to his anger towards the State's Attorney for having successfully prosecuted, convicted and incarcerated him, in that he had hoped to gain some advantage with respect to the charges pending against him by testifying on behalf of the State. The court further found that Thompson's statements made in the jury room added to the reliability of his statements to the police and before the grand jury. The court found that although Thompson's out-of-court statements implicating defendant were insufficient alone to convict defendant, they were sufficient when coupled with Adams' testimony.

With respect to the stipulation that Adams never told Detective Kelly that defendant or "Peanut" was present at the scene or told codefendant Moten to shoot, the court found that

although it had some impeachment value, its value was diminished because Adams indicated that he had talked to several officers, but could not recall the name of the officer to whom he gave that information. As to the stipulation regarding Adam's grand jury testimony, the court indicated, "Context of the Grand Jury testimony, I have no context." Based upon Adams' convincing testimony at trial and that he had previously known the defendants, as well as Thompson's statements to police officers and his testimony before the grand jury coupled with his statements in the jury room, the court found defendant and codefendant Moten guilty of the murder of Jackson and the attempted murder of Abrams and Camphor.

Defense counsel Swano filed a posttrial motion challenging the sufficiency of the evidence. Swano argued that the trial court failed to adequately consider the impeachment value of the stipulations regarding Adams' statement to Kelly and testimony before the grand jury. Specifically, Swano argued that "Adams had opportunities to make identifications during the course of the investigation and Grand Jury," and "he didn't make specifically any identification of [defendant] until he came into this court and for the first time identified [defendant] as somebody involved." After hearing the arguments, the trial court denied the posttrial motion. With respect to the sufficiency of the evidence, the trial court stated that although Thompson's out-of-court statements alone were not originally that impressive as evidence, when corroborated with statements he made on the eve of trial, the evidence was more impressive. Defendant was sentenced to natural life imprisonment for the murder and concurrent sentences of ten years on the two counts of attempted murder. Defendant's convictions and sentences were affirmed on direct appeal. People v. Bailey, 265 Ill. App. 3d 262, 638 N.E.2d 192 (1994).

Subsequently, defendant filed a *pro se* post-conviction petition for relief under the Act alleging, *inter alia*, ineffective assistance of counsel. After reviewing the allegations in the petition, the circuit court docketed the petition for further consideration and appointed counsel to represent defendant. Ultimately, the matter was reassigned to private counsel. Thereafter, on August 17, 2000, the State filed a motion to dismiss the petition, arguing *inter alia* that he failed to satisfy the requirements for ineffective assistance of counsel claims.

On September 2, 2002, defendant filed an amended post-conviction petition, asserting, *inter alia*, the ineffective assistance of trial counsel, William Swano, in that he (1) had a conflict of interest due to his joint representation of both defendant and codefendant Moten; (2) failed to timely file a written discovery motion and, as a result, failed to adequately impeach Adams with his grand jury testimony. In support, defendant attached a recent supreme court case which revealed that after defendant's trial, Swano had been convicted of bribing judges, had perjured himself, and had been taking drugs during the period that he represented defendant. Defendant filed a response to the State's motion to dismiss in support of the allegations contained in his amended petition.

The circuit court denied the State's motion to dismiss the petition and set the matter for an evidentiary hearing. In denying the motion, the court made the following findings:

> "I think that given the very peculiar and--thank goodness--very rare
> circumstances that coalesced Mr. Swano's behavior in the criminal
> court, and [his] admitted lying, and [his] admitted bribing of a
> judicial officer and witnesses; that, coupled with the joint

> representation of people in this case; it would be completely
>
> unwarranted for me to dismiss this case without the opportunity for
>
> an evidentiary hearing."

To preserve review in this court, the State filed an answer to defendant's amended post-conviction petition, reiterating the grounds for dismissal of the petition and denying defendant's allegations of ineffective assistance of counsel.

Prior to the evidentiary hearing, defendant supplemented the record with various documents related to Swano's past criminal activity. Those documents revealed that in 1991, two years after defendant's conviction and sentence, Swano was indicted on federal racketeering charges relating to his representation of certain gang members. The indictment specified that Swano repeatedly bribed judges, presented perjured evidence, and received cocaine in exchange for his legal services. Swano ultimately pled guilty to federal racketeering charges and agreed to cooperate with federal prosecutors in that case. Subsequently, Swano was suspended from the practice of law and was disbarred in 1996, seven years after the end of defendant's trial.

The parties also filed a joint submission of undisputed facts and submitted the grand jury testimony of Adams. Therein, Adams testified that he was in the vicinity of 4101 South Federal on the night of the occurrence. When asked whether he was alone or with other people, he replied, "With a friend, sir." When asked if he saw Moten there, he responded, "Yes, sir." When asked whether Moten was alone or with other people, Adams replied, "with three more other guys." Adams then testified that he saw people come through the breezeway and that Moten turned around and shot the third person in the breezeway.

Defendant testified at the evidentiary hearing that the fees for his defense, as well as codefendant Moten's defense, were paid for by the leader of the Gangster Disciples street gang. Defendant stated that trial counsel never told him there could be potential problems resulting from his dual representation of defendant and codefendant Moten. Nevertheless, on cross-examination, he acknowledged that prior to opening statements in his bench trial, he heard the judge and trial counsel discussing the issue of conflict due to joint representation. Defendant further acknowledged that Swano asked him on the record if he had talked to defendant and that defendant responded, "I talked to him. No conflict." On redirect, defendant testified that he understood that a conflict would have resulted in separate trials for him and codefendant Moten.

The parties stipulated that if the trial judge testified, he would state that although he could not recall giving conflict of interest advisements to the defendants, he was confident that he gave detailed and complete advisements, and that each defendant acknowledged that he understood those advisements and that they did understand them. "I say this with certainty because that was my practice in every case where there was representation by one lawyer or a group of lawyers of two or more defendants in the same case."

The State also entered into evidence the statement of William Swano. With respect to his failure to file a written pretrial motion for discovery, Swano indicated that it was common practice for an attorney to make an oral or a written motion for discovery at the time of an appearance because the State complied with discovery pursuant to the Illinois Supreme Court Rules, regardless of whether a motion was written or oral. Swano further stated that the State and the defense learned of the existence of the grand jury transcript of Thompson and Adams

from the "John Doe investigation" before the testimony of Thompson had been completed and that the transcript, including the testimony of Thompson and Adams, was tendered to him at that time. Swano also noted that he had interviewed Thompson prior to trial and also had his statement to police available to him. Swano indicated that he then filed a written motion for discovery and a stipulation regarding the grand jury testimony of Adams, which he believed perfected the impeachment of Adams' identification testimony at trial.

With respect to the issue of conflict, he stated that since it was a bench trial, he elected to represent both defendants with co-counsel. He determined that since both defendants had consistent defenses of reasonable doubt there was no conflict. Swano further stated that he discussed the dual representation with defendant and in open court when the issue was raised prior to trial. He explained to defendant that if there was a conflict in the testimony with respect to codefendant Moten, it may not have been in defendant's interest to have him represent both defendants. Based upon Swano's knowledge of the case, he believed there was no conflict because the codefendants had not made statements against each other.

After hearing arguments from the parties, the postconviction court made the following findings. The court found that Swano lacked credibility with respect to the issue of trial tactics, given his history as an admitted liar, briber of judges, abuser of drugs, and a federally convicted felon. The court then analyzed the actions of Swano under the test enunciated in Strickland v. Washington and found that Swano's failure to file a written pretrial discovery motion to be both objectively unreasonable and prejudicial. In articulating its reasoning, the court stated,

"There was a significant opportunity to impeach Mr.

Adams that was lost because, A, there was no discovery motion; B, there was no attempt to obtain nor did they obtain the grand jury testimony of Mr. Adams before his examination on the witness stand; and, C because when it was attempted to be cured by a stipulation, that was done in a wholly inadequate manner."

The postconviction court reiterated that the trial judge had placed great weight on the trial testimony of Adams and that the stipulation regarding the grand jury testimony of Adams lacked context and was therefore was given little weight.

With respect to the conflict of interest, the postconviction court found that at the time of any conflict admonishments that may have been given, there was no knowledge on anyone's part of the existence of the grand jury testimony wherein Adams identified Moten and not defendant. The court then stated in pertinent part as follows:

"What does the attorney do, even if he has full knowledge of that, at that time? Well, it seems to me he doesn't even attempt to represent both people because, [w]hat are you doing in that situation? Do you decide to challenge the testimony of Mr. Adams not identifying Mr. Bailey? Because you have to challenge that testimony if you are trying to protect Mr. Mot[e]n. Or do you sit back and hope that the failure of Mr. Adams to identify Mr. Bailey becomes an issue of reasonable doubt in Mr. Bailey's case? You can't serve two masters under those circumstances.

And, so, how you can have an effective waiver of conflict when the nature of the conflict is not even apparent to the people having the conversation at that time, I don't know.

It seems to me once the existence of this testimony of Mr. Adams before the grand jury is known to the lawyers in the court, that would occasion the requirement of a second inquiry as to conflict of interest because now you know that there is testimony arguably favorable to one and unfavorable to another. And what is the attorney representing both to do under those circumstances? It seems to me to be a very, very difficult, if not unsolvable, problem."

At the conclusion of the hearing, the postconviction court granted defendant's petition for relief and ordered a new trial.

ANALYSIS

The State contends on appeal that the postconviction court erred in granting defendant a new trial based upon the ineffective assistance of trial counsel. The Post-Conviction Hearing Act (725 ILCS 5/122-1 et seq. (West 1994)) provides a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. People v. Pendleton, 223 Ill. 2d 458, 471, 861 N.E.2d 999, 1007 (2006). To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. Pendleton, 223 Ill. 2d at 471, 861 N.E.2d at 1007.

Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation. Pendleton, 223 Ill. 2d at 473, 861 N.E.2d at 1008. When a petition is advanced to the third stage for an evidentiary hearing where fact-finding and credibility determinations are involved, we will not reverse those findings unless they are manifestly erroneous. Pendleton, 223 Ill. 2d at 473, 861 N.E.2d at 1008. Nevertheless, if the issues presented are based on pure questions of law, we apply a *de novo* standard of review, unless the judge presiding over the proceedings had some special familiarity with the trial or sentencing of the defendant and that had some bearing on the disposition of the postconviction petition. Pendleton, 223 Ill. 2d at 473, 861 N.E.2d at 1008.

In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by this court in People v. Albanese, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693 (1984). More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. A reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694, 104 S. Ct.

at 2068, 80 L. Ed.2d at 698. The failure to satisfy either prong of the <u>Strickland</u> test precludes a finding of ineffective assistance of counsel. <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699.

The postconviction court held that because of Swano's failure to file a written pretrial discovery motion and obtain Adams' grand jury testimony prior to his cross-examination, "there was a significant opportunity to impeach Mr. Adams that was lost," and that Swano's attempt to cure this error through a stipulation "was done in a wholly inadequate manner." At the outset, we recognize that the failure to file a motion for discovery is neither *per se* proof of incompetency nor *per se* ineffective assistance of counsel as a matter of law. <u>People v. Williams</u>, 63 Ill. 2d 371, 373, 349 N.E.2d 14, 16 (1976). Rather, such a determination must be determined on a case-by-case basis from the record before the court. <u>Williams</u>, 63 Ill. 2d at 373, 349 N.E.2d at 16.

Here, the record reflects that although Swano did not file a written pretrial discovery motion, the State filed an answer, and at the time of trial, Swano had indeed been provided with the grand jury transcript from which the grand jury returned an indictment. Neither Thompson or Adams had testified at that hearing. Additionally, the record reflects that the prosecutor was not aware of the additional grand jury transcript from a John Doe investigation until Thomas took the stand at trial. As soon as she became aware of it, there was a continuance, and the prosecutor tendered the relevant transcripts to Swano. Accordingly, Swano had Adams' transcript from the grand jury during the trial, albeit after Adams testified on cross-examination. Although counsel may have been deficient in failing to file a proper written motion under Supreme Court Rules, Swano had the relevant grand jury testimony at trial. Thus, the question we must consider is

whether defendant was ultimately prejudiced by Swano's delay in obtaining that testimony. See People v. Clemons, 277 Ill. App. 3d 911, 921, 661 N.E.2d 476, 483 (1996) (although counsel may have been under a duty to make formal request for discovery, no indication in the record that failure to make such request prejudiced the defendant).

Defendant maintains, and the postconviction court found, that defendant was prejudiced because Adams' grand jury testimony would have provided a significant opportunity for impeachment by omission of the State's key eyewitness and that the stipulation was inadequate because it had no context. "The omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would state such fact, if true, may be shown to discredit his testimony as to such fact." People v. Henry, 47 Ill. 2d 312, 320-21, 265 N.E.2d 876, 882 (1970); People v. Owens, 65 Ill. 2d 83, 357 N.E.2d 465 (1976); 3A Wigmore on Evidence, §1042 at p.1058 ("the underlying test is, would it have been natural for the person to make the assertion in question?"). The admissibility of impeachment evidence is a matter within the sound discretion of the trial judge. People v. Baggett, 115 Ill. App. 3d 924, 934, 450 N.E.2d 913,920 (1983).

At trial, during direct examination, Adams implicated defendant as someone he previously knew as "Peanut," and the one who said, "shoot him, shoot him." At the grand jury hearing, Adams was asked to respond to specific questions from the State's Attorney as follows:

> "Q:    And at the time did you see a person that you knew to be
>
>        Darryl Moten?
>
> A:    Yes, sir.

1-04-3835

> Q: How long have you known Darryl Moten?
>
> A: About a year and a half, since he got out of Audy Home.
>
> Q: Was he alone or with other people?
>
> A: With three more other guys.
>
> Q: And when you first saw Mr. Moten, where were you?
>
> A: Walking like right beside him, you know, walking from the store."

It is evident from the grand jury testimony that Adams was never asked if he could identify the names of the other people that were with Moten. Under such circumstances, in a question and answer situation on the witness stand, it would not necessarily have been natural or probable for Adams to volunteer defendant's name or someone named "Peanut" in response to a specific question on the stand about whether Moten was alone or with other people. See, *e.g.*, People v. Green, 118 Ill. App. 3d 227, 233-34, 454 N.E.2d 792, 797 (1983) (in question and answer format, it would not have been natural or probable for witness to respond with information concerning a second incident about which he was not questioned); see also Strino v. Premier Healthcare Associates, P.C., 365 Ill. App. 3d 895, 850 N.E.2d 221 (2006) (trial court did not abuse its discretion in holding that trial testimony was not impeachable with deposition testimony where witness was not asked questions in the deposition that would have naturally elicited that information). Indeed, when Adams was asked whether he was alone or with others, he did not identify Thompson by name even though he knew his own friend's name but, rather, replied that he was "with a friend, sir."

Given the nature of the questioning here before a grand jury, where there was no

- 18 -

opportunity for a narrative, the trial court would have been well within its discretion in finding that Adam's failure to volunteer this information was not unnatural and, therefore, in finding that impeachment on that basis was inadmissible. Under that scenario, defendant would have benefitted from Swano's stipulation regarding the absence of Adam's identification of defendant in his grand jury testimony.

Defendant cites to Carroll v. Krause, 295 Ill. App. 552, 15 N.E.2d 323 (1938) for the proposition that to be relevant, it need not be shown that the "fact" at issue in the proffered impeachment was the subject of "specific[] interrogat[ion]" in the prior proceeding. Carroll, 295 Ill. App. 552, 15 N.E.2d at 328. Nevertheless, even if it was admissible as impeachment, it would have had little, if any, more weight than the stipulation that was ultimately entered on defendant's behalf. When assessing the importance of the failure to impeach for purposes of a Strickland claim, "[t]he value of the potentially impeaching material must be placed in perspective." People v. Jimerson, 127 Ill.2d 12, 33, 535 N.E.2d 889, 898 (1989).

The stipulation entered into evidence was that Adams never identified defendant before the grand jury. The postconviction court found that the stipulation was inadequate because the trial court indicated that the stipulation lacked context. However, even if the trial court were given the context, meaning the questions asked and Adams' answers before the grand jury, the weight of the impeachment would not have been any greater. Adams was never asked the relevant questions that would have elicited an identification of defendant during the questioning about Moten. Accordingly, defendant failed to meet his burden to establish under Strickland that he was prejudiced by Swano's use of the stipulation to impeach Adams' trial testimony instead of

cross-examining Adams with his grand jury testimony. The postconviction court's determination that defendant was ultimately prejudiced was against the manifest weight of the evidence.

Furthermore, although in convicting defendant, the trial court found that Thompson's testimony at the grand jury and statement to police were insufficient alone to convict him, the trial court reconsidered the weight of Thompson's evidence during a hearing on defendant's post-trial motion. Therein, the court made the following statement:

> "And I tell you, Thompson's out-of court statements taken alone
>
> perhaps originally were not that impressive as evidence, but when
>
> you corroborate by the statements he made on the eve of trial, eve
>
> of his testimony, to me at least, the evidence becomes more
>
> impressive."

Subsequently, on direct appeal, in considering the sufficiency of the evidence to convict defendant, this court noted that "the court could have found [defendant] guilty solely on the eyewitness testimony of [Thompson], notwithstanding that such testimony occurred in another proceeding, to wit: before the grand jury." People v. Bailey, 265 Ill. App. 3d 262, 277, 638 N.E.2d 192, 202 (1994). Thus, even if Adams' grand jury testimony was utilized instead of the stipulation, its impeachment value was minimal where Thompson's testimony alone would have been a sufficient basis to convict defendant. For all of the foregoing reasons, the postconviction court erred in finding that defendant met his burden of proof to establish that Swano's delay in obtaining Adams' grand jury testimony ultimately prejudiced him. It cannot be said that there would have been a reasonable probability that the outcome of the trial would have been different.

We next address the State's contention that the postconviction court erred in finding that Swano's performance was tainted by a conflict of interest based upon his representation of both defendants. A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. People v. Hardin, 217 Ill. 2d 289, 299, 840 N.E.2d 1205 (2005). The prohibition against conflicts is based upon the notion that no attorney can "serve two masters." People v. Spreitzer, 123 Ill. 2d 1, 13, 525 N.E.2d 30, 34 (1988).

Nevertheless, "the mere fact of joint representation of multiple criminal defendants does not establish a *per se* violation of the right to effective counsel." People v. Orange, 168 Ill. 2d 138, 156, 659 N.E.2d 935, 943 (1995), citing Holloway v. Arkansas, 435 U.S. 475, 482, 98 S. Ct. 1173, 1178, 55 L. Ed. 2d 426, 433 (1978). "Treating multiple representation as creating a *per se* conflict would put an end to multiple representation altogether, since a 'possible conflict inheres in almost every instance of multiple representation,' and a *per se* rule would 'preclude multiple representation even in cases where '[a] common defense * * * gives strength against a common attack.' " Spreitzer, 123 Ill. 2d at 17, 525 N.E.2d at 36, quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed. 2d 346, quoting Glasser v. United States , 315 U.S. 60, 92, 62 S. Ct. 457, 475, 86 L. Ed. 680, 710-11 (1942) (Frankfurter, J., dissenting).

A defendant may establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest manifested at trial that adversely affected his counsel's performance. People v. Morales, 209 Ill. 2d 340, 348, 808 N.E.2d 510, 514-15 (2004). To establish a conflict, the defendant has the burden of showing " 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " Morales, 209 Ill. 2d

at 348, 808 N.E.2d at 514-15, quoting People v. Spreitzer, 123 Ill. 2d at 18, 525 N.E.2d at 37. If an actual conflict has been shown, a defendant need not demonstrate prejudice in order to obtain relief. People v. Nelson, 82 Ill. 2d 67, 72, 411 N.E.2d 261, 264 (1980). However, mere speculative or hypothetical conflicts are insufficient to demonstrate [an] actual conflict of interest. People v. Berland, 74 Ill. 2d 286, 301, 384 N.E.2d 649, 655 (1978). In addition, "the mere availability of a strategy that would have helped one criminal codefendant at the expense of another does not create hostility between their interests." People v. Mahaffey, 165 Ill. 2d 445, 457, 651 N.E.2d 174, 181 (1995).

Here, the postconviction court premised its holding on a conflict of interest which arose from the grand jury testimony of Adams because Adams only implicated Moten and not defendant. The court held that Swano was ineffective in failing to recognize that he would have to challenge Adams' grand jury testimony in order to protect Moten, and in failing to obtain a proper waiver from defendant at that time. Nevertheless, the postconviction court did not articulate how the grand jury testimony of Adams actually adversely affected Swano's representation of defendant at trial.

The record does not support an actual conflict. Defendant maintains that if Swano had highlighted Adams' failure to identify defendant before the grand jury, Swano would have inevitably have also highlighted that Adams had identified Moten before the grand jury. However, Adams' grand jury testimony implicating Moten would not have been admitted as substantive evidence. People v. Olinger, 176 Ill. 2d 326, 360, 680 N.E.2d 321, 338 (1997). In a bench trial, if the court has admitted evidence for a limited purpose, the court is presumed to only have

considered it for that purpose. People v. Jackson, 202 Ill. 2d 361, 369, 781 N.E.2d 278, 282 (2002). Thus, even if Adams' omission was admissible as impeachment, it would not have been considered as substantive evidence against Moten. Indeed, by entering the stipulation, Swano was able to avoid any possibility that Adams' testimony regarding Moten would be used in an improper way. Moreover, defendant's argument merely suggests a possible conflict relating to Swano's representation of Moten, who is not a party to this appeal. Ultimately, both defendants pursued a united, reasonable doubt defense. Their defenses were not antagonistic. Accordingly, it was error for the postconviction court to grant defendant a new trial based upon a potential conflict of interest that never materialized into an actual conflict at trial.

Moreover, we reject defendant's argument that a conflict arose because Swano failed to use Adams' failure to identify defendant before the grand jury in his closing argument because it would have also highlighted that Adams had identified Moten before the grand jury. Contrary to defendant's assertion, Swano indeed argued in closing argument Adams' failure to identify defendant before the grand jury and during his interview with Detective Kelly.

> "Now, you have heard by way of stipulation the testimony of Detective Kelly and the Grand Jury testimony in which at no time did Mr. Torrence Adams ever tell Detective Kelly or the Grand Jury that he saw [defendant] or a person by the name of Peanut in the vicinity or say "'shoot, shoot.'"

Swano specifically broke down the testimony of both Thompson and Adams to show how they were both impeached. Accordingly, because the record does not support that an actual conflict of

1-04-3835

interest arose, it was error for the postconviction court to grand defendant a new trial. Based upon our disposition, we need not address the State's additional arguments. For all of the foregoing reasons, we reverse the judgment of the circuit court.

Reversed.

GREIMAN and CUNNINGHAM, JJ., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellant,

v.

HERNANDEZ BAILEY,

Defendant-Appellee.

**No. 1-04-3835**

**Appellate Court of Illinois
First District, Third Division**

**Filed: June 29, 2007**

**PRESIDING JUSTICE THEIS delivered the opinion of the court.**

**Greiman and Cunningham, JJ., concur.**

**Appeal from the Circuit Court of Cook County
Honorable James R. Epstein, Judge Presiding**

| | |
|---|---|
| For PLAINTIFF - APPELLANT | Richard A. Devine, State's Attorney<br>James E. Fitzgerald, Assistant State's Attorney<br>Annette Collins, Assistant State's Attorney<br>Brad Dickey, Assistant State's Attorney<br>300 Daley Center<br>Chicago, IL 60602 |
| For DEFENDANT - APPELLEE | Richard H. McLeese<br>900 West Jackson Blvd.<br>Suite #6W<br>Chicago, IL 60607 |

1-04-3835