2024 IL App (2d) 230257-U
Nos. 2-23-0257 & 2-23-0258 cons.
Order filed October 22, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 20-CF-1367 20-CF-1544 |
| DAMAR D. McDONALD, | ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Where defense counsel represented both defendant in a murder case and defendant's codefendant in a separate drug case, defendant failed to show that counsel's dual representation created a specific deficiency in counsel's strategy, tactics, or decision-making regarding the State's global plea offers.

¶ 2   Defendant, Damar D. McDonald, appeals from judgments in two cases. In case No. 20-CF-1544 (drug case), after a bench trial, defendant was convicted of unlawful delivery of 15 grams or more but less than 100 grams of a substance containing cocaine, a Class X felony (720 ILCS 570/401(a)(2)(A) (West 2018)). In case No. 20-CF-1367 (murder case), after a bench trial,

defendant was acquitted of two counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 2018)) but convicted of one count of armed violence (*id.* § 33A-2(a)). The cases were consolidated for sentencing. Defendant received consecutive prison terms of 12 years in the drug case and 28 years in the murder case. He appealed. We consolidated the appeals.

¶ 3       On appeal, defendant contends that the judgments cannot stand because his counsel in the murder case also represented a codefendant in the drug case and, therefore, was working under an actual conflict of interest. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5       On August 24, 2020, in the murder case, defendant was charged by information with two alternative counts of the first degree murder of Annie Nunally (*id.* § 9-1(a)(1), (a)(2)). On September 14, 2020, attorney Lawrence Wade II entered his appearance for defendant in the murder case.

¶ 6       On September 23, 2020, in the drug case, the State (1) indicted defendant on one count of unlawful delivery of 15 grams or more but less than 100 grams of a substance containing cocaine, which offense occurred on February 25, 2020, and one count of unlawful delivery of one gram or more but less than 15 grams of a substance containing cocaine (720 ILCS 570/401(c)(2) (West 2018)), which offense occurred on February 7, 2020; and (2) indicted codefendant Blake Mears on one count of criminal drug conspiracy (*id.* § 405.1(a)) for knowingly enabling defendant to contact the undercover agent who received the drugs on February 7, 2020. The murder and drug cases proceeded jointly.

¶ 7       On October 7, 2020, the State indicted defendant on three alternative counts of the first degree murder of Nunally (720 ILCS 5/9-1(a)(1), (a)(2) (West 2018)).

¶ 8       At an April 7, 2021, hearing, Wade stated:

"It has come to my attention when we I [*sic*] first began my representation [of defendant], [defendant] was only here on the first three first degree murder charges. He was subsequently charged with a drug conspiracy, which I do have a conflict with. I do believe we requested a Public Defender be appointed."

The trial court appointed Assistant Public Defender Jason Powell to represent defendant in the drug case. The State clarified that "the co-defendant for wh[om] there [was] a conflict [was] Blake Mears." Wade entered no appearance for defendant in the drug case.

¶ 9    On April 14, 2021, the State filed three additional charges in the murder case. Counts IV and V charged defendant with the felony murder of Nunnally (*id.* § 9-1(a)(3)). Count IV alleged that defendant killed Nunnally while committing aggravated battery (*id.* § 12-3.05(a)(1)) against Clemiya Carter by striking her with a handgun and causing her great bodily harm. Count V alleged that defendant killed Nunnally while committing armed violence (*id.* § 33A-2(a)) in that, while armed with a dangerous weapon, a handgun, he committed aggravated battery (*id.* § 12-3.05(c)) against Carter by striking her with the handgun. Count VI charged defendant with armed violence (*id.* § 33A-2(a)) against Carter in that, while armed with a dangerous weapon, a handgun, he committed aggravated battery (*id.* § 12-305(c)) against Carter by striking her with the handgun (*id.* § 12-3.05(c)). On April 15, 2021, defendant pleaded not guilty to all charges in both cases.

¶ 10    On May 19, 2021, in the drug case, the trial court severed defendant's and Mears's trials. The State elected to proceed first on the drug case. On August 11, 2022, per agreement, Mears pleaded guilty in an unrelated case and the State dismissed the charge against him in the drug case.

¶ 11    On September 26, 2022, Powell requested a continuance of the bench trial in the drug case. When the trial court inquired about the status of the murder case, Assistant State's Attorney Ryan Koehl stated:

"The State did make a global offer to the defense on all of these cases.

Since Mr. Wade is here on [the murder case] and [case No.] 18 CF 546,[1] the State had made an offer on the murder case *** of 28 years. In exchange for that plea, the State would term out the probation in 18 CF 546 and nolle pros the drug case ***. *That offer was made a year and a half ago*. That offer was rejected. There is no stand-alone offer on the drug case. The State has elected to proceed first on the drug case ***. After that, Mr. Wade and I will be wanting to talk to the Court about scheduling the murder case for trial, but we can't get there until we try the drug case." (Emphasis added.)

Wade confirmed the foregoing statements. The court continued the bench trial on the drug case to November 14, 2022.

¶ 12    Following the November 14, 2022, bench trial in the drug case, the trial court found defendant guilty of both counts and continued the cause for sentencing.

¶ 13    On March 20, 2023, the trial court denied defendant's posttrial motion in the drug case. Before the court proceeded to sentencing, Koehl informed the court that the State had recently made two alternative plea offers in the cases. Under the first offer, defendant would plead guilty to second degree murder with a 20-year agreed sentence, which would be mandatorily consecutively to a 20-year agreed sentence in the drug case, both sentences to be served at 50%. Under the second offer, defendant would enter an open plea to second degree murder, and there would then be a joint sentencing hearing where defendant would face mandatorily consecutive sentences of 4 to 20 years for second degree murder and 6 to 30 years in the drug case, both

---

[1]The specifics of this case are not apparent from the record, except that defendant was convicted and received probation.

sentences to be served at 50%. Koehl informed the court that defendant rejected both offers. Wade confirmed that he had discussed both offers with defendant over the past two weeks and that he rejected them. When asked by the court for comment, Powell noted that he had discussed "options" with defendant in the drug case, but defendant insisted on going to trial. Powell had no comment about the murder case. The court postponed sentencing in the drug case.

¶ 14    On May 12, 2023, Koehl told the court that, since the March 20, 2023, hearing, the State had made "a slightly better offer or more favorable offer to the Defendant" than the offers described at that prior hearing. Koehl elaborated:

"MR. KOEHL: We have offered the Defendant the option of a fully negotiated plea in the murder case, *** to the reduced charge of a second degree murder with a fully negotiated sentence of 20 years *** at 50 percent consecutive to a sentence of 10 years *** at 50 percent on the drug case *** and agree to term out the probation case [No. 18-CF-546].

That's a reduction from the prior offer, where it had been 20 years on a second degree and 20 years on the drug case. ***.

It's my understanding that offer has been rejected; is that correct, Mr. Wade?

MR. WADE: That is correct, Judge.

*** [Koehl] wrote out his offers, wrote out the possible penalties. I made a copy of that and took that to [defendant] at the jail. I do believe he did receive that; and when I met with him, he explained that he went over that, and he continues to persist in his innocence, and he is requesting a bench trial.

THE COURT: All right, we will proceed with the trial.

MR. KOEHL: *** [T]here was one other plea option beyond that. This was the same as what was mentioned [on March 20, 2023,] but just so it's of record, we also gave the Defendant the option of an open plea in [the murder case] to the reduced charge[ ] of second degree murder at which [*sic*] the Court would *** hold [a] joint sentencing hearing on that case *** and *** the drug case that is pending sentencing; and at that sentencing hearing, the sentencing range on the second degree murder charge would be four to 20 years *** at 50 percent, although that's actually a probationable [*sic*] charge, and then consecutive to any sentence the Defendant were to get in the drug case ***.

*** 

The Defendant had also rejected that option ***; is that correct?

MR. WADE: That is correct.

THE COURT: All right.

We will proceed to trial then [in the murder case]."

The State voluntarily dismissed counts I through III in the murder case.

¶ 15    On May 15, 2023, a bench trial commenced on the remaining three counts in the murder case. On May 17, 2023, at the close of the State's case, the trial court granted defendant's motion for directed findings on counts IV and V (felony murder). Following the defense case, the court found defendant guilty of count VI (armed violence). On August 1, 2023, the trial court sentenced defendant to consecutive prison terms of (1) 12 years, at 50%, for unlawful delivery of a controlled substance[2]; and (2) 28 years, at 15%, for armed violence. Defendant timely appealed. We have consolidated the appeals.

---

[2]The trial court did not distinguish between the two convictions of unlawful delivery of a

¶ 16                                    II. ANALYSIS

¶ 17     On appeal, defendant contends that his convictions must be vacated because Wade suffered

from an actual conflict of interest, based on his representation of defendant in the murder case and

Mears, defendant's codefendant in the drug case. Defendant argues that this dual representation

compromised Wade *vis-à-vis* the global plea offers the State made. He emphasizes Wade's

admission at the April 7, 2021, hearing that he now had a "conflict" because defendant was charged

in the drug case. For the following reasons, we affirm the judgments.

¶ 18     The right to conflict-free representation is inherent in the constitutional right to the

effective assistance of counsel. *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978); *People v. Nelson*,

2017 IL 120198, ¶ 29. There are two categories of conflict of interest: *per se* and actual. *People v.*

*Fields*, 2012 IL 112438, ¶ 17. "A *per se* conflict of interest exists where certain facts about a

defense attorney's status, by themselves, engender a disabling conflict." *Id.* "Generally, a *per se*

conflict arises when defense counsel has a connection to a person or entity that would benefit from

an unfavorable verdict for the defendant." *People v. Yost*, 2021 IL 126187, ¶ 39. The supreme

court explained in *Yost* that

        "[its] caselaw now recognizes only three categories of *per se* conflict of interest: (1) when

        defense counsel has a contemporaneous association with the victim, the prosecution, or an

        entity assisting the prosecution; (2) when defense counsel contemporaneously represents a

        prosecution witness; and (3) when defense counsel was a former prosecutor who was

        personally involved in the prosecution of the defendant." *Id.* ¶ 66.

---

controlled substance, although the 12-year sentence was authorized only for the Class X offense

charged. See 720 ILCS 570/401(a)(2)(A) (West 2018).

¶ 19     "If an alleged conflict of interest does not fit into one of these *per se* conflict categories, a defendant may still assert a claim of actual conflict of interest." *Id.* "To establish an actual conflict of interest, a defendant must identify an actual conflict that adversely affected his counsel's performance." *Id.* ¶ 38. "The defendant is required to identify a specific deficiency in his counsel's strategy, tactics, or decision making that is attributable to the alleged conflict." *Id.*; *People v. Jones*, 121 Ill. 2d 21, 29 (1988) ("Under this approach, the burden is placed on the defendant to show with some specificity that an actual conflict of interest adversely affected his representation."). "[T]the mere fact of joint representation of multiple defendants does not create a *per se* violation of the right to effective assistance of counsel." *Nelson*, 2017 IL 120198, ¶ 29; but see Ill. R. Prof'l Conduct (2010) R. 1.7, cmt. 23 (eff. Jan 1, 2010) ("The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one codefendant."). Thus, "to prevail on a claim of ineffective assistance of counsel because of joint representation of criminal codefendants by a single attorney, a defendant must show that an actual conflict of interest manifested" during the representation. *People v. Taylor*, 237 Ill. 2d 356, 375-76 (2010). " '[M]ere speculative or hypothetical conflicts are insufficient to demonstrate an actual conflict of interest.' " *People v. Schutz*, 2017 IL App (4th) 140956, ¶ 32 (quoting *People v. Bailey*, 374 Ill. App. 3d 1008, 1022 (2007)). We review *de novo* whether counsel labored under a conflict of interest. *People v. Salamie*, 2023 IL App (2d) 220312, ¶ 56.

¶ 20     In his opening brief, defendant contends only that there was an actual conflict. Further, he does not contend that Wade's performance at his trials and sentencing were adversely affected by the dual representation of defendant and Mears. Instead, he focuses on Wade's handling of the several global plea offers that the State made.

¶ 21    Defendant argues primarily that, because Wade admitted at the April 7, 2021, hearing that there was a "conflict," defendant need not show with specificity that Wade's representation of him was compromised. We disagree. Wade did recognize that defendant's drug charges presented a "conflict" because Wade represented codefendant Mears in the same case. However, in Wade's mind it was a *potential* conflict that could be avoided by simply appointing the public defender to represent defendant in the drug case. The court ordered the appointment, and Wade never entered an appearance for defendant in the drug case. Thereafter, any conflict would have to be based on Wade's representation of Mears in the drug case and defendant in the murder case. We must determine whether defendant has shown, with "some specificity" (*Jones*, 121 Ill. 2d at 29), that Wade's representation of him was compromised. Even if Wade had acknowledged an actual conflict arising from defendant's charges in the drug case,[3] our determination would rest not on his conclusional statement but on the facts of the case. As noted, to establish an actual conflict here, the facts must show "a specific deficiency in [Wade's] strategy, tactics, or decision making that is attributable to the alleged conflict" (*Yost*, 2021 IL 126187, ¶ 38).

¶ 22    Defendant has not carried his burden of showing specific harm arising from Wade's representation of defendant in the murder case and Mears in the drug case. The State makes the incisive point that, on August 11, 2022, Mears pleaded guilty to an unrelated charge and the State

---

[3]We note that, at the April 7, 2021, hearing, the prosecutor told the trial court, and Wade did not disagree, that "the co-defendant for wh[om] there [was] a conflict [was] Blake Mears." Apparently, Wade did not even contend that *defendant* might be affected by the potential conflict of interest. Of course, in any event, Wade's belief about a potential conflict up until April 7, 2021, does not affect our resolution of whether the record shows that there *was* a conflict thereafter.

dismissed the charge against him in the drug case.[4] This ended Wade's representation of Mears. Thus, when the State made the global plea offers described in court on March 20, 2023, and May 12, 2023, Wade could not have been under any conflict of interest.

¶ 23    In his reply brief, however, defendant notes that the State initiated plea negotiations with Wade while he still represented Mears in the drug case. At the September 26, 2022, hearing, the prosecutor referenced a proposal that "was made a year and a half ago," in which the State offered defendant a 28-year term in the murder case and the dismissal of the charges in the drug case; defendant rejected the offer. Eighteen months before September 2022 was March 2021. In March 2021, Mears's drug charge was still pending and Wade represented defendant in the murder case. According to defendant, Wade faced a conflict *vis-à-vis* the March 2021 offer. Defendant provides a "simple hypothetical" to illustrate the conflict:

> "Mears' case, alleging that he conspired with [defendant] to deliver cocaine, remained pending at the time of the offer and would remain open for the next 17 months. If [defendant] rejected the State's offer to dismiss the drug charges and his drug case remained pending at a time when Mears' case was called for trial, [defendant] could be expected to invoke his right against self-incrimination and be unavailable to testify if called as a prosecution witness against Mears. To the contrary, if [defendant] accepted the global offer and his drug cases were dismissed, he presumably would be available to testify against Mears without invoking his right against self-incrimination. Under this realistic

---

[4]When defendant filed his opening brief, the record did not include anything from Mears's separate case. After the State filed its response brief, but before defendant filed his reply brief, we granted the State's motion to supplement the record with the judgment of August 11, 2022.

scenario, Wade would be placed in the position of considering the interests of his client Blake Mears when counseling [defendant] whether to accept the offer to plead guilty to first-degree murder and have his drug cases dismissed. Thus, Wade's presentation of the State's first global offer to [defendant] must be considered to present an actual conflict of interest [as] counsel is deemed constitutionally ineffective where his allegiance to a client is 'diluted by conflicting interests or inconsistent obligations.' [Citation.]"

This is precisely the approach that cannot support a claim of actual conflict. " '[M]ere speculative or hypothetical conflicts are insufficient to demonstrate an actual conflict of interest.' " *Schutz*, 2017 IL App (4th) 140956, ¶ 32 (quoting *Bailey*, 374 Ill. App. 3d at 1022). Although defendant repeatedly purports in his reply brief to identify an actual conflict of interest, his argument is ultimately that "certain facts about [his] attorney's status, by themselves, engender[ed] a disabling conflict." *Fields*, 2012 IL 112438, ¶ 17. Thus, instead of proceeding on the theory of his opening brief—that Wade had only an actual conflict of interest—defendant shifts to a claim that Wade had a *per se* conflict of interest. He thereby seeks to free himself from the requirement of showing that the conflict actually impaired Wade's performance.

¶ 24 We decline to accept defendant's argument, for two reasons. The first is procedural. Defendant's opening brief relied solely on a theory of actual conflict and addressed the performance-impairment requirement, albeit unsuccessfully. His argument that a hypothetical or speculative impairment is sufficient is a new theory that does not fit the essential criteria for showing an actual conflict. The argument appears for the first time in his reply brief, which he could use only for responding to arguments in the State's brief. See Ill. S. Ct. R. 341(j) (eff. Oct. 1, 2020). Points not raised in the opening brief are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1,

2020). Thus, defendant has forfeited his argument that a *per se* conflict existed. See *People v. Balaj*, 265 Ill. App. 3d 1070, 1077 (1994).

¶ 25    The second reason is substantive. As noted earlier, our courts have consistently held that a single attorney's representation of multiple defendants does not create a *per se* conflict. See, *e.g.*, *Nelson*, 2017 IL 120198, ¶ 29. Rather, although "there is always the *possibility* that the interests of codefendants may diverge" (emphasis in original) (*Taylor*, 237 Ill. 2d at 375), a defendant claiming that dual representation created an actual conflict of interest must show "specific defects in the representation" (*id.* at 373), *i.e.*, specific actual harm. Since defendant did, in fact, reject the March 2021 offer, his claim of actual conflict assumes that (1) Wade advised defendant to reject the March 2021 offer; (2) Wade's advice was tainted by his loyalty to Mears; (3) without that tainted advice, defendant would have accepted the offer; and (4) the rejection of the offer specifically harmed defendant. Defendant does not attempt to establish these propositions. His reliance on a *per se*-level threshold cannot be squared with binding supreme court authority requiring a higher threshold in these circumstances. Thus, even aside from forfeiture, we must reject defendant's argument.

¶ 26                           III. CONCLUSION

¶ 27    For the reasons stated, we affirm the judgments of the circuit court of Lake County.

¶ 28    Affirmed.